126

(C. D. 1275)

GREAT WESTERN MERCANTILE CO.⎱
SAMUEL S. PERRY ⎰ v. UNITED STATES

United States Customs Court, Second Division

(Decided September 28, 1950)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Lawrence A. Harper* of counsel) for the plaintiffs.

*David N. Edelstein*, Assistant Attorney General (*Dorothy C. Bennett, Richard H. Welsh*, and *Arthur R. Martoccia*, special attorneys), for the defendant.

Before RAO, FORD, and EKWALL, Judges

FORD, Judge: The two suits against the United States listed in schedule "A," hereto attached and made a part hereof, present for our determination the question of the proper classification of certain

imported merchandise upon which duty was levied at the rate of 65 per centum ad valorem under paragraph 1211 of the Tariff Act of 1930, the merchandise having been classified as manufactures in chief value of silk, not specially provided for. Plaintiffs made several claims in their original protests, but the only claim relied upon, made by proper amendment, is that "The merchandise is dutiable at 45 per cent under paragraph 1535, Tariff Act of 1930 (fishing tackle and parts thereof, finished or unfinished)."

At the trial, counsel for the plaintiffs abandoned the claim in protest 81387–K insofar as it relates to the last item on page 4 of the white sheet of the invoice and described as "Natural Color Polished."

Certain samples were admitted in evidence as representing the involved merchandise, and also illustrative exhibits, which were marked collective illustrative exhibit A, collective illustrative exhibit B, illustrative exhibit C, and illustrative exhibit D. These exhibits are now before us and have had our careful examination, inspection, and consideration.

Counsel for the plaintiffs made the following statement with reference to the issue presented by the two protests here involved and the proof he expected to offer:

* * * They relate to goods represented by Illustrative Exhibits A, B, C and D, and the plaintiff's claim is that that type of merchandise is dutiable as fishing tackle under paragraph 1535, and we make that claim by virtue of the contention that under the rules of commercial designation the rate applies here. I might say—this is preliminary—it might save argument later—we will not attempt to show that the imported goods were bought and sold under the name "fishing tackle", which is the tariff term. We will, however, attempt to show that although it was sold under other names, such as knotless gut, it was considered by those who dealt in that product in the wholesale trade in June of 1930 to be within the class of goods which were commercially considered to be fishing tackle.

In order to narrow the issue in this case, counsel for the respective parties agreed at the trial that the involved merchandise is not used as sutures or ligatures, nor material for making sutures or ligatures, and that the merchandise was not so used at and prior to June 1930, nor since that time.

In line with the above statement, counsel for plaintiffs offered the testimony of four witnesses which, as they insist in their brief filed herein, fully supports their contention. In rebuttal, counsel for the defendant offered the testimony of two witnesses. Counsel for plaintiffs also offered certain catalogs or price lists. These were admitted in evidence and marked illustrative exhibit E, collective exhibit F, illustrative exhibit G, illustrative exhibit H, and illustrative exhibit I.

Plaintiffs' witness, Dickson, testified that he was president of the American Import Co. and had held that position for 11 years; that in June 1930, his salesmen were selling, throughout the United States, merchandise such as the samples herein; that such sales were being made at wholesale under the name of "Silk fishing gut." When

asked "What articles in June, 1930, were described in the catalogue under the heading of fishing tackle?" the witness replied: "I will have to say that I cannot testify to the exact contents of one catalogue. I can tell you the lines that were included year in and year out. They included fishing poles, fishing hooks, fishing leaders, snell hooks, jigs, lures, snaps and swivels."

As to the description which the wholesale trade applied to merchandise such as the samples herein in June 1930, the witness stated that "Some of them called it silk fishing gut, some called it knotless gut. I have heard it termed 'imitation fishing gut' as differentiated from actual true gut." Counsel for the defendant asked the witness: "Is it your statement that in the wholesale trade which you referred to, the term 'fishing tackle' had a meaning other than its common meaning?" and the witness replied: "To my mind the two terms are synonymous. When I think of the commercial term 'fishing tackle', I think in terms of what I believe you consider the common term 'fishing tackle'." "XQ. Your statement is that the commercial meaning is the same as the common meaning?—A. As far as I see, yes"; that was not only true in June 1930, but "It has never been different to my knowledge."

On redirect examination the witness was asked:

In June, 1930, did those people in the wholesale trade with whom you dealt, likewise consider it to be within the meaning of the words "fishing tackle"?

and replied in the affirmative. Counsel for the plaintiffs explained that "it" in the above question referred to illustrative exhibits A, B, C, and D. However, the above question gives no indication of whether it was addressed to the common meaning or to the commercial meaning of the term "fishing tackle."

The second witness to testify for the plaintiffs, Morris Greenblat, stated that he was associated with or part owner of Hurricane Import Co. and that he was also at one time associated with Samuel S. Perry; that his organization sold merchandise such as that here involved only in the States of California, Oregon, and Washington; that such merchandise was sold by said Perry at wholesale in June 1930 as "* * * artificial fishing gut, Jap gut, Jap fishing gut, synthetic gut, and silk gut; possibly a few others that I can't recall"; that the articles which were included within the category of "fishing tackle" were "Fishing reels, bamboo fishing poles, cotton nets, fishing gut, fishing gut leaders, fishing gut snells." When asked if material for making fishing leaders would be included in the general trade meaning of fishing tackle, the witness replied: "In the usual wholesale trade, I don't think so."

On redirect examination, however, the witness testified as follows:

R. Q. Regardless of whether illustrative exhibits A, B, C and D are parts of leaders, or are unfinished products, or are finished products, do you still say that

in that coil form, 10 yards to a card, 6 cards connected, it was or was not within the commercial understanding of the words "fishing tackle"?—A. If you take a ten yard coil of gut, or a 40 yard coil, or any other length, you could call it parts of fishing tackle.

R. Q. Did the trade so consider it in that form, in the lengths of 10, or 60, or 40 or of 30 yards?—A. Very definitely a part of fishing tackle.

The next witness to testify for the plaintiffs stated that the activities of the company with which he was associated covered all the New England States; that during the year 1930 he was buying for Folsom Arms Co. goods of the type represented by the exhibits herein; that in the wholesale trade in 1930 in the area where he dealt the words "fishing tackle" had a meaning which included certain articles; that that meaning was uniform throughout the trade as he contacted it; that the entire trade with which he came in contact considered articles like collective illustrative exhibits A and B to be within the description of fishing tackle.

On cross-examination the witness testified that collective illustrative exhibit A is mere material "To make leaders." After having read to him two definitions of the term "fishing tackle" from standard dictionaries, the witness stated that the common and commercial meaning of the term were the same.

The next witness for the plaintiffs stated that in the year 1930 he purchased material or goods such as that here involved for the purpose of making fishing tackle; that during the year 1930 the words "fishing tackle" had a definite meaning which included knotless gut; that this meaning was uniform as between the several purchasers with whom he dealt in the wholesale trade.

On cross-examination the witness stated that he used merchandise like the exhibits herein to snell hooks and make leaders. This witness, after having read to him two definitions from standard dictionaries, stated that the common and commercial meaning of the term "fishing tackle" were not the same. "Fishing tackle is different because there is the thousand items; they only specify three or four there"; that he would add to the articles included in the definitions: "Swivels, lures, flies, snell hooks, jackets, weighters, boots; they are all fishing tackle"; and that each article he had specified was a completed article.

The first witness for the defendant stated that he had sold merchandise similar to that here involved from 1925 to 1941 in Pennsylvania, New York, and the New England States; that the commercial meaning of the term "fishing tackle" was the same as the common meaning and that illustrative exhibits A, B, C, and D would not be included within that definition; that the merchandise represented by the exhibits herein is mere material for making up leaders or snelling hooks or flies or whatever a person may want to make up.

On cross-examination, however, the witness stated that within the trade understanding of the term "fishing tackle" knotless gut would

be included, and that the catalogs that he encountered in the wholesale trade had it listed under the general classification of fishing tackle.

Defendant's second witness stated that his sales covered Pennsylvania, New York, and the New England States; that the commercial meaning of the term "fishing tackle" as he had found it in the wholesale trade was the same as the common meaning; that illustrative exhibits A, B, C, and D would not, as such, be included within the definition of "fishing tackle" "Because it is raw material and fishing tackle is usually considered finished articles, like I would say were enumerated in the definitions, and it even covers more things than enumerated."

On cross-examination the witness testified that within his understanding in the wholesale trade the term "fishing tackle" meant "Items that were enumerated, like rods, weighters, shoes, leaders, all those kinds of fishing articles used for fishing"; that knotless gut was not included; that he issued catalogs which related in part to knotless gut as raw material; that the printed words on the catalogs included the words "fishing tackle" and accessories.

The catalog of The American Import Co., marked illustrative exhibit E, shows the following on the front page thereof: "Fishing Tackle—Quotations to the Jobber—Season 1940." On page three of this exhibit appears, under the heading "Silk Fishing Gut in Coils," an illustration of that which is entitled "Bestmade Knotless Gut." Collective exhibit F consists of several sheets of paper on the top of which appears the name "Samuel S. Perry." These sheets are denominated as price list No. 675–T, dated August 1, 1934; price list No. 890–J, dated August 1, 1935; and price list No. 1048–J, dated August 1, 1936. Nothing appears on any of these sheets of paper comprising collective exhibit F to indicate that knotless gut, such as or similar to that here involved, was advertised or sold under the designation of "fishing tackle."

Illustrative exhibit G is a catalog, issued by Folsom Arms Co., which the witness stated was for the year 1929. At the request of counsel for the plaintiffs, the witness marked or bracketed that portion of page 86 which he said pertains to knotless gut. That portion of page 86, bracketed by the witness, refers specifically and exclusively to "Knotless Leaders."

Illustrative exhibit H is another catalog issued by Folsom Arms Co., which the witness testified was for the year 1932. At the request of plaintiffs' counsel, the witness marked or bracketed that portion of page 100 relating to knotless gut. That portion of page 100, marked by the witness, refers specifically and exclusively to "Knotless Leaders" and to "Special Knotless Leaders."

Illustrative exhibit I is a catalog of Edw. K. Tryon Co., and is dated 1932. Particular reference is made to page 124 of this exhibit

and this entire page is bracketed with red pencil, and it also has two sub-brackets. At the top of this page, in large type, appears "KING-FISHER 'NIPPON' KNOTLESS LEADERS" and under the sub-brackets appears "Kingfisher 'Nippon' Gut in Coils of 40 Yards," "Kingfisher 'Nippon' Gut in Coils of 100 Yards," and "Kingfisher 'Nippon' Gut on Cards."

As to each of the catalogs which was issued subsequent to June 17, 1930, the date of the passage of the Tariff Act of 1930, with the exception of illustrative exhibit I, counsel for the plaintiffs attempted to show by the witnesses that their respective companies issued a similar catalog on or prior to the above-stated date. Some of the witnesses testified that their company did issue a similar catalog on or prior to June 17, 1930.

Counsel for the plaintiffs, in their brief filed herein, strenuously contend the record establishes, under the rule of commercial designation, that the involved knotless gut is well within the tariff term "fishing tackle and parts thereof." With this contention, for the reasons hereinafter stated, we cannot agree.

In the case of *United States* v. *Fung Chong*, 34 C. C. P. A. (Customs) 40, C. A. D. 342, our appellate court observed:

In the interpretation of the tariff act the function of the court is to ascertain and carry out the intent of Congress. One of the rules to be followed in discovering that intent is the rule of commercial designation. It was established almost a century ago and has been uniformly adhered to by all the courts down through the years. It has been described by the courts as a wise rule "often claimed in customs litigation and rarely established," *Jas. Akeroyd & Co. et al.* v. *United States, supra.* [15 Ct. Cust. Appls. 440, T. D. 42641.]

We recognize the fact that the commercial meaning of a generic term may include articles more specifically described by more specialized names, as alleged by counsel for the plaintiffs. *Drew* v. *Grinnell*, 115 U. S. 477; *Robertson* v. *Salomon*, 130 U. S. 412; *Pickhardt* v. *Merritt*, 132 U. S. 252; *Cadwalader* v. *Zeh*, 151 U. S. 171; *Dejonge* v. *Magone*, 159 U. S. 562; and *United States* v. *Baruch*, 223 U. S. 191.

In *Two Hundred Chests of Tea*, 22 U. S. 430, the Supreme Court of the United States, addressing itself to the question of commercial designation, laid down the following rule:

The true inquiry, therefore, is, whether, in [the United States in] a commercial sense, the tea in question is known, and bought and sold, and used, under the denomination of bohea tea.

The true inquiry in this case is, whether, in a commercial sense, the knotless gut in question was known, and bought, and sold, at and prior to the passage of the act here involved, under the generic denomination of "fishing tackle and parts thereof." As heretofore pointed out, there is much testimony before us to the effect that the involved merchandise was considered by people in the wholesale trade

to be within the meaning of the term "fishing tackle," but it is not sufficient to show that the merchandise falls within the meaning of the term "fishing tackle"; it must be shown that the merchandise falls within the *commercial* meaning or designation of the term involved, and that such commercial meaning was uniform, definite, and general throughout the trade in the United States in which the merchandise was bought and sold at and prior to the passage of the involved act.

Testimony of a witness that he had sold merchandise such as that here involved at wholesale as "artificial fishing gut, Jap gut, Jap fishing gut, synthetic gut, and silk gut; possibly a few others that I can't recall" is of little, if any, value in establishing commercial designation. Likewise, testimony that the articles which are included within the category of "fishing tackle" are "Fishing reels, bamboo fishing poles, cotton nets, fishing gut, fishing gut leaders, fishing gut snells" is of little value in establishing commercial designation, when the witness later admitted that material for making fishing leaders would not be included within the general trade meaning of fishing tackle. In the same category is the testimony that "If you take a ten yard coil of gut, or a 40 yard coil, or any other length, you could call it parts of fishing tackle." The defect in such a statement is not cured by testimony that merchandise in lengths of 10, or 60, or 40, or 30 yards, was by the trade very definitely considered as parts of fishing tackle. Here again there is a complete failure to show whether the "trade" was the retail or wholesale trade, whether such consideration had reference to the common or commercial meaning, and to fix any definite date when this was true.

The above observations, regarding the testimony referred to, are true generally as to the remainder of the testimony.

The following statement is quoted from plaintiffs' brief:

Counsel for plaintiffs, as perforce they must, have accepted the Court of Customs and Patent Appeals' ruling that the common meaning of the term "fishing tackle" excludes the present merchandise and has undertaken to prove that it is included within the commercial meaning of that term.

The evidence establishes quite definitely that the commercial meaning of the term "fishing tackle" was the same as the common meaning of that term at and prior to the passage of the present tariff act, three of plaintiffs' witnesses and two of defendent's witnesses having testified to that effect. In *American Import Co.* v. *United States*, 26 C. C. P. A. (Customs) 72, T. D. 49612, our appellate court held that knotless gut in 60-foot lengths was mere material for making leaders. Counsel for the plaintiffs admit that the *American Import Co.* case, *supra*, holds that the common meaning of the term "fishing tackle" excludes the present merchandise.

In *United States* v. *Ben Felsenthal & Co.*, 16 Ct. Cust. Appls. 15, T. D. 42713, our appellate court held:

We think it well settled that where a court of competent jurisdiction settles and judicially defines the common meaning of a term used in the statute, such a determination and adjudication becomes matter of law. In *Marvel* v. *Merritt*, 116 U. S. 11, Mr. Justice Matthews said:

> The words used are not technical, either as having a special sense by commercial usage, nor as having a scientific meaning different from their popular meaning. They are the words of common speech, and, as such, their interpretation is within the judicial knowledge, and, therefore, matter of law.

> \*     \*     \*     \*     \*     \*     \*

> This court has followed the same rule and when, as a matter of law, it has once determined the common meaning of a term used in a statute, has adhered to such common meaning until a legislative change in the statutory enactment in question has necessitated a changed determination of such meaning.

Since the decision in the *American Import Co.* case, *supra*, holding that within the common meaning identical merchandise was excluded from the term "fishing tackle," there has been no legislative change in the language of paragraph 1535 of the Tariff Act of 1930, in which paragraph the term "fishing tackle" appears. In view of the above facts, a holding that the involved merchandise was within the provision for "fishing tackle" would be directly contrary to the decision of our appellate court in the *American Import Co.* case, *supra*. Furthermore, under the decision in the *Passaic Worsted Co.* case, *supra*, if the involved knotless gut is not commonly known as "fishing tackle," as held in the *American Import Co.* case, *supra*, and it being established by the evidence herein that the common and commercial meaning of the term "fishing tackle" is the same, "\* \* \* no occasion for proof of commercial designation exists."

In *Passiac Worsted Co.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, after setting out testimony in that case, which is very similar to that here, our appellate court stated:

Such testimony does not establish commercial designation, as we have had occasion many times to state. *United States* v. *Exstein Co.*, 16 Ct. Cust. Appls. 328, T. D. 43079; *United States* v. *Schade & Co.*, 16 Ct. Cust. Appls. 366, T. D. 43092; *Hampton, Jr.* v. *United States*, 12 Ct. Cust. Appls. 490, T. D. 40695; *United States* v. *Schoemann & Mayer*, 17 C. C. P. A.—[349], T. D. 43778.

At the risk of unnecessary reiteration, we repeat a suggestion as to this kind of evidence frequently heretofore made by us. If, in the case at bar, it was sought to establish commercial designation of the imported machines as textile machinery, before attempting to do so it must be legally admitted that they have a commercial designation which differs from their common designation and that, under the common designation, they are not textile machinery. Otherwise, and if they are commonly known as textile machinery, no occasion for proof of commercial designation exists. Then, having admitted this necessary legal premise, the next inquiry must be: "By what name are these articles designated uniformly, generally, and definitely in the trade wherever they are bought and sold?" If, to such an inquiry, the witness can respond that they are so designated as textile machinery, the evidence is competent and tends to prove commercial designation. A very good and substantial reason exists for so directing the inquiry. If the witness is uncertain in his statement, such uncertainty will readily appear on

cross-examination. If, on the other hand, the witness is asked whether a certain article belongs within a certain class, the answer he gives will simply be his opinion, and the true facts may not be readily available on cross-examination. The rule of commercial designation is a wise one, but the rule is narrow and must be closely adhered to.

Considering the testimony in this case in the light of the rule laid down in *Two Hundred Chests of Tea, supra*, and the *Passaic Worsted Co., supra*, and authorities therein cited, we are convinced that such testimony falls far short of establishing that the involved merchandise is within the commercial designation or understanding of the generic term "fishing tackle and parts thereof." In other words, the oral testimony fails to establish that the knotless gut in question was known, and bought, and sold, and used, under the generic denomination of "fishing tackle and parts thereof," and that such a designation was uniform, general, and definite in the trade wherever it was bought and sold, within the rule laid down in the above authorities.

Coming now to the catalogs or price lists hereinbefore referred to, we find that each catalog or price list, with the exception of illustrative exhibit G, was issued subsequent to the passage of the Tariff Act of 1930, and under the rule laid down by the Circuit Court of Appeals, Second Circuit, in *United States* v. *Nordlinger*, 121 Fed. 690, these documents must be rejected as evidence tending to establish commercial designation.

In *Nordlinger* v. *United States*, 115 Fed. 828, the Circuit Court for the Southern District of New York held:

\* \* \* It is true that many of the importer's witnesses are directly interested in the result of this litigation, but on the other hand their testimony is strongly corroborated by a large number of *publications* addressed to the wholesale trade in different sections of the country from which it appears that Leghorn citron has uniformly and for many years been classed as a dried fruit. These publications were issued since the date of the act, but were made competent by the undisputed testimony that the classification began years prior to the act and has continued unchanged to the present day. [Italics ours.]

In reversing the above decision, the Circuit Court of Appeals, Second Circuit, in *United States* v. *Nordlinger, supra*, employed the following language:

\* \* \* The tariff act under construction was passed March 3, 1883. The testimony as to trade meanings, therefore, should be confined to a period anterior to that date. By so confining it, very much of the evidence must be rejected, notably the bulky package of newspaper market reports and price lists, practically all of which were published long subsequent to 1883.

Applying the law, as above set out, to the catalogs and price lists in evidence herein, with the exception of illustrated exhibit G, all of which were published subsequent to June 17, 1930, it is clear that we must reject these documents as evidence tending to establish a commercial meaning of the involved knotless gut as "fishing tackle and parts thereof."

In *Austin, Nichols & Co.* v. *United States*, 4 Ct. Cust. Appls. 313, T. D. 33519, our appellate court quoted, with apparent approval, that portion of the decision in *Nordlinger* v. *United States*, 115 Fed. 828, quoted above, and then observed:

While this case was reversed upon appeal, it was so reversed upon questions of law, the conclusions of law of the appellate court being predicated upon the facts introduced into the record and established as stated by the lower court. See United States *v.* Nordlinger (121 Fed., 690).

An examination of the record in the *Austin, Nichols* case, *supra*, shows that the only catalogs which were offered in evidence therein, were catalogs "* * * which you issued and which you have seen dated on and prior to August 5, 1909, * * *." This is also made clear from the following language from the decision:

1. It seems from the decisions of the Board of General Appraisers and the courts to have long been the established practice to admit into evidence wholesale-trade *catalogues, issued on or prior to the enactment of the particular tariff act in question*, of the wholesale-trade classification of various articles. [Italics ours.]

It appears, therefore, that any statement contained in the decision in *Austin, Nichols* v. *United States*, *supra*, regarding publications issued since the date of the act being made competent by undisputed testimony, was not necessary to a decision in that case and was *obiter dictum*.

Referring again to the case of *United States* v. *Nordlinger*, *supra*, we observe the following:

The fundamental question in the case is one of fact. Does the proof show that the phrase Congress has used to cut exceptions out of the three great groups of fruits is used in trade and commerce so uniformly with a peculiar meaning that it must be assumed that Congress used it with the same meaning, and thus made the descriptive words selected by it less comprehensive than they would be in ordinary use; * * *.

* * * * * * *

Upon this record we are unable to reach the conclusion that the phrase "fruits preserved in sugar" has such a definite, uniform, and general trade meaning that it will not operate to draw out of the third great group of fruits named in the free list, viz., "fruits dried," fruits which, although dried, are also in fact preserved in sugar.

The decision of the Circuit Court is reversed, and the decision of the board sustained.

In our view, the above quotation makes it quite clear that the original *Nordlinger* decision was reversed upon a question of fact, or because of lack of proof, rather than upon questions of law. However, be that as it may, the language employed by the Circuit Court of Appeals in reversing the decision of the lower court in the *Nordlinger* case, is so clear and definite as to admit of no other constructions except that testimony as to trade meanings should be confined to a period at or prior to the date of the act being construed, and that evidence in the form of a "bulky package of newspaper market reports

and price lists, practically all of which were published long subsequent to 1883," the date of the act there involved, must be rejected as evidence. The above decision is also an unequivocal reversal of the holding of the Circuit Court that, although these publications were issued since the date of the act, they "* * * were made competent by the undisputed testimony that the classification began years prior to the act * * *."

Upon the authority of *United States* v. *Nordlinger, supra,* we reject as evidence all the catalogs and price lists which were issued subsequent to the date of the passage of the Tariff Act of 1930.

Illustrative exhibit G is the only catalog or price list in evidence herein which was issued prior to the passage of the Tariff Act of 1930. In offering that exhibit, counsel for the plaintiffs stated:

Mr. Malay, will you mark the portion of page 86 which pertains to knotless gut, please; just bracket it, please.

THE WITNESS: Yes. [The witness does as requested.]

An examination of the exhibit as marked or bracketed, as requested by counsel for the plaintiffs, shows that the portion of page 86, marked or bracketed as aforesaid, has reference exclusively to "Knotless Leaders," an article of merchandise with which we are not here concerned. While the words "Fishing Tackle" appear on the outside cover page of this exhibit, it is also observed that on the first inside page appears the following: "Manufacturers Shot Guns, Leather and Canvas Goods—Audley Patent Holsters—General Sporting Goods—Everything for the Sportsman."

Although the witness testified that this catalog, on page 86, referred to knotless gut, an examination of page 86 fails to disclose any reference to merchandise designated as knotless gut, although there is a reference on said page to merchandise described as "SELECTED MIST COLOR SILKWORM GUT," and "DRAWN SILKWORM GUT." As to the first classification above, there is nothing to indicate the length thereof, but the second classification is designated as "Length 16 inches." While it is true that the witness testified with reference to the merchandise before the court, that "We classified it as knotless gut," nothing is to be found on page 86 which corroborates this testimony.

The following quotation from plaintiffs' brief makes it clear that the only portion of page 86 of illustrative exhibit G upon which they rely was that portion bracketed by witness Malay:

The Folsom Arms Company issued a catalogue in 1929, covering products sold by it to the wholesale trade, which listed the knotless gut on page 86 at the point bracketed by Mr. Malay, and which was offered as plaintiffs' exhibit G.

However, accepting the entire page 86 of illustrative exhibit G as a part of the record herein, we find that the same, considered with all

the other evidence, is not sufficient to establish that the involved merchandise is included within the commercial designation or understanding of the generic term "fishing tackle and parts thereof," as alleged by the plaintiffs.

In *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs) 146, T. D. 48009, our appellate court made the following observation regarding the value of catalogs in establishing commercial designation:

We are of the opinion that if this catalogue, and other catalogues introduced, referred to the articles at bar as "combs" and "cutters", on and prior to the enactment of the Tariff Act of 1922, and that these catalogues were thoroughly circulated throughout the United States, this fact, though competent, could not constitute satisfactory proof of commercial designation, because, for one reason, it appears in this record that the trade did not uniformly accept such terms and continued to designate the articles by other names. It surely cannot be logically contended that a dealer in a given kind of merchandise can successfully control a tariff classification of imported merchandise by using certain language in cataloguing the same. Of course, proper catalogue designations ofttimes are helpful in arriving at the trade understanding, but they are never conclusive proof of the facts asserted.

For the reasons stated and following the authorities cited and quoted, all claims of the plaintiffs are overruled. Judgment will be rendered accordingly.