(C. D. 1496)

PACIFIC OVERSEAS CO.
W. J. BYRNES & CO. } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided February 5, 1953)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel) for the plaintiffs.
*Charles J. Wagner*, Acting Assistant Attorney General (*Richard H. Welsh, Dorothy C. Bennett*, and *Daniel I. Auster*, special attorneys), for the defendant.

Before RAO, FORD, and EKWALL, Judges; RAO, J., dissenting

FORD, Judge: This case was originally assigned to Judge Rao who prepared a proposed majority opinion. Judge Lawrence having disqualified himself from participating in this decision, Judge Rao's opinion was submitted to the writer for approval or disapproval. The writer being in disagreement with the final conclusion reached by Judge Rao, Judge Ekwall was assigned to participate in the decision, and he having agreed with the writer's views, the case was assigned to the writer to prepare the majority opinion.

The reasoning advanced by Judge Rao in support of his conclusion that the involved merchandise is not inlaid linoleum within the common meaning of that term is logical and sound, and the authorities cited in support thereof are apt and to the point. On this phase of the case, therefore, and with Judge Rao's permission, we hereby adopt as our opinion the decision originally prepared by Judge Rao, as follows:

"This is an action to recover excess duties alleged to have been erroneously assessed by the collector of customs at the port of Los Angeles against an importation of linoleum. Two grades or patterns of this material comprise the importation in question. One is denominated in the invoice as "3rd Gauge Super Parquet." The other carries the invoice description of "3rd Gauge Sheet Marble." Both types of linoleum were classified as "inlaid linoleum" and assessed with duty at the rate of 25 per centum ad valorem, as provided for in paragraph 1020 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. In their protest, plaintiffs alleged that neither grade of linoleum involved in the importation at bar was inlaid linoleum, and that, therefore, the merchandise was within the provision for all other linoleum in said paragraph 1020, as modified, *supra*, and is dutiable at only 15 per centum ad valorem.

"The trial proceeded upon the basis of the claim as stated in the protest, and evidence concerning both super parquet and sheet marble linoleum was adduced. Subsequent to the trial, however, and in the brief filed in behalf of plaintiffs, counsel waived the importer's claim with reference to the "3rd Gauge Super Parquet" and

expressly limited its protest to the "3rd Gauge Sheet Marble." Accordingly, therefore, the protest claim that the items invoiced as "3rd Gauge Super Parquet" are not inlaid linoleum is overruled.

"A sample of the linoleum which remains the subject of dispute is in evidence as plaintiffs' exhibit 2. It is a segment taken from the importation which is approximately 10 by 12 inches in size, and has an over-all marbleized effect, with color tones of tan, brown, green, gray, and white. Exhibit 2–A is a smaller piece of linoleum, approximately 3½ by 7 inches, which was cut from exhibit 2, with the court's permission, for use in connection with the deposition of one Edward Nicholson Barran, director in charge of sales of the English manufacturer, Linoleum Manufacturing Co., Ltd.

"This witness testified by deposition concerning the method of manufacture of different kinds of linoleum, including the involved merchandise. In the course of his testimony, he referred to various exhibits by numbers which he apparently arbitrarily assigned to them. In an effort to coordinate the exhibit numbers mentioned in the deposition with those introduced at the trial, and to avoid confusion, the same were each designated plaintiffs' exhibit 3, plus the number used by the witness in testifying.

"The manufacturing processes described by the witness Barran accord substantially with those in use in various American linoleum companies as related by defendant's witnesses O'Hara and Newman of Congoleum-Nairn, Inc., and the Sloane-Blabon Corp., respectively.

"It therefore may be said that the instant merchandise is produced in the following manner: Linoleum cement, a product formed by the combination, under heat, of oxidized linseed oil with resins, is mixed with powdered cork, or wood flour, and pigments to create what is known as a plasticized mass. This is then reduced to granules, of a fairly coarse consistency (plaintiffs' exhibit 3–20), which are passed through heavy rollers, called calenders, to form a sheet of the required thickness. The pressure of the rollers gives the granules a directional streak, known as a jaspe pattern, and a coarse-grained jaspe effect is obtained, as shown in plaintiffs' exhibit 3–21. This roughly jasped sheet is cut into suitable lengths and passed through another calender, at right angles to its original direction. The "streaks are, by the pressure of the rollers and the presence of several thicknesses of sheeting being introduced at the same time, drawn out and dispersed. Its effect is called in the trade sheet marble," and is illustrated by plaintiffs' exhibit 3–21–A. The second calendering is usually keyed on to a hessian or burlap backing, although it may equally well be keyed on to an impregnated felt paper. A sample of the second calendering on a burlap backing is in evidence as plaintiffs' exhibit 3–21–B, which, except for coloring and size, substantially simulates plaintiffs' exhibits 2 and 2–A.

"It further appears that as the result of this processing the pattern penetrates the linoleum through to the backing, although not necessarily in a vertical direction.

"There is also in evidence as plaintiffs' exhibit 3–17, a 9-inch square of linoleum which plaintiffs concede is inlaid. It is made in the following manner:

"* * * Inlaid linoleum is produced by reducing the plasticised mass to fine granules which can then be run through a stencil on to the burlap back. The granules take the form of the stencil and, although two colours are usually mixed to go through one stencil plate, it is by no means necessary. After being deposited on the burlap back, the sheet passes through a heavy calender which consolidates the granules without distorting them. There is, therefore, no directional bias in inlaid patterns, as shown by Sample 17 of Exhibit 1. [Plaintiffs' exhibit 3–17.] The formation of the granules goes right through to the burlap backing.

"Other methods of producing inlaid linoleum will hereinafter be adverted to.

"Samples of jaspe and granite linoleum are also in evidence as plaintiffs' exhibits 3–19 and 3–27. No useful purpose is served by describing these or detailing the methods by which they are produced. It is sufficient to observe that the manufacturing steps undertaken to produce them resemble fairly closely those adopted in connection with the merchandise at bar.

"This, in essence, is plaintiffs' case. It is urged that linoleum which is formed by the calendering and cross-calendering of a granulated plasticized mass does not fall within the common meaning of the tariff term "inlaid linoleum" and, hence, that the merchandise in controversy is within the provision of paragraph 1020, *supra*, as modified, for all other linoleum. Plaintiffs contend that the essential characteristic of inlaid linoleum, as commonly understood, as in the case of other inlaid articles, refers to the fitting into a background-material of other materials of different shapes and appearance, the whole having a decorative effect. It is further urged that the fact that the pattern penetrates from the surface to the backing is merely an incidental result of the nature of linoleum and the impracticability of cutting only a part of the way beneath the surface for the purpose of introducing the inlay, as in the case of furniture, but that this latter characteristic is not a determinant of inlaid linoleum.

"It is the position of the Government that the sole criterion for testing whether linoleum is inlaid linoleum within the common understanding of that term is whether the color scheme or pattern penetrates the fabric from the surface to the backing; that, therefore, the processes employed to produce the linoleum are immaterial considerations; and that the merchandise at bar being possessed of the vital characteristic of having the pattern perpetuated throughout is inlaid linoleum, within the common meaning.

"For an authoritative discussion of linoleum, we turn to the 1947 edition of the Encyclopaedia Britannica. It is there stated:

"Linoleum can be divided into two broad classes: (a) Plains and (b) inlaids. These can again be further sub-divided, from the manufacturing point of view, into—(1) Plains, Printed, Jaspés, Granites and Moires. (2) · Inlaids—Moulded, Straight-line, Granites, Parquetries and Marbles.

"**Plain and Printed Linoleums.**—The granulated material is calendered on to the canvas backing by heavy steam-heated rolls. The same type of material is used for plain and printed goods, but the latter are usually thinner, and have the pattern printed on in oil colours afterwards. Granites, Jaspés and Moires are, with modifications, made in the same way, the variously coloured scratched materials being blended before calendering. * * *

"**Inlaid Linoleum.**—When produced by the moulding process, the granulated material of different colours is sifted through stencils on to canvas lying on a table. A separate stencil, having perforations corresponding to the desired position in the pattern, is used for each colour, the scratched material being thrown on and the perforations filled. The completed pattern is afterwards put through a flat hydraulic "making press," to consolidate it, and the face is perfected by passing through a "finishing press." This method gives very fine carpet and floral effects.

"**Straight-line Inlaids.**—For these two processes are used. (a) Hand-made: the stencils in the moulding process are in this case replaced by pieces of previously sheeted material, cut to the desired shape, and laid on to form the pattern required. The rest of the operations are as in the moulding process. Parquetries, Marbles and Tile patterns are made in this way. (b) Machine-made: in this process the scratched material is rolled into a continuous sheet, and led, together with the backing, under a revolving "cutting cylinder." In the periphery of the cylinder steel knives are embedded, forming a complete pattern. Between the knives plungers operate selectively from the inside and place on the canvas the tesserae of the particular part of the pattern required. The pieces not required are carried round between the knives and are ejected.

"See also Summary of Tariff Information, 1920, Summary of Tariff Information, 1929, and United States Tariff Commission Tariff Information Surveys on Articles in Paragraphs 1020 and 1022 of the Tariff Act of 1922, published in 1929.

"In the case of *Hunter & Witcombe* v. *United States*, 7 Treas. Dec. 322, T. D. 25063, the Board of General Appraisers (now the United States Customs Court), was called upon to determine whether certain merchandise invoiced as "granite linoleum" or "granite" was inlaid linoleum within the meaning of paragraph 337 of the Tariff Act of 1897. It appears that the merchandise there involved consisted of linoleum "in the manufacture of which different colors are so introduced and laid as to penetrate the body of the plastic material from the surface to the burlap foundation, the colored materials taking such form as the pressure of the rollers and resistance of the materials give them, and which, because it is in imitation of granite, is called 'granite linoleum'." The board, in holding that such merchandise was not inlaid linoleum, relied upon the definition of the word "inlaid" adopted by the Circuit Court for the Southern District of New York in the

case of *Hunter* v. *United States*, 121 Fed. 207 (affirmed without opinion in 127 Fed. 1022), wherein it was stated: " 'Inlaid' means laid into a definite space, as a separate part of the material of the structure."

"Linoleum was again the subject of judicial consideration in the case of *Keveney* v. *United States* and *Germania Importing Co.* v. *United States*, 1 Ct. Cust. Appls. 101, T. D. 31111, the question being whether linoleum made by the stencil process, hereinabove described, was inlaid linoleum within the meaning of said paragraph 337 of the Tariff Act of 1897. The court, after quoting definitions of "inlay" and "inlaid" from several lexicons, stated:

"In Hunter *v.* United States (121 Fed. Rep., 207), relied upon by the importer, Judge Wheeler, in dealing with so-called granite linoleum, said:

" "Inlaid" means laid into a definite space, as a separate part of the material of the structure; and the product is of a higher grade of manufacture, on which the higher duty appears to be laid.

"This statement of Judge Wheeler does not relate to the manner in which the laying in should occur, as that question was not before the court. Nor do we conceive that that method should be controlling. It is the finished article which is made the subject of duty, and the method by which the result is obtained is immaterial. The process by which the material in question is made results in a substantial separation of the different colors and figures, and the actual laying in of the substance in different figures so that the inlaid substance extends through the whole thickness of the linoleum and can be worn down to the base without effacing or affecting the figure. We hold this to be, in the sense in which the term was employed in the tariff act, inlaid linoleum.

"We do not agree with the contention of defendant that the decision in the *Keveney* case, *supra*, has so broadened the common meaning of the term "inlaid linoleum" as to include all linoleum in which the pattern extends through the whole thickness of the fabric. It is true that the court's primary concern was the finished article, with its accompanying effect, and not the method by which it was manufactured. Nevertheless, it is also true that the court saw in that finished article a "substantial separation of the different colors and figures, and the actual laying in of the substance in different figures * * *." Moreover, there can be no justification for the court's recital of dictionary definitions of the word "inlay" and "inlaid" which plainly suggest a setting-in of one material into the body of another, if its holding be construed as a rejection or repudiation of such definitions. It is to be assumed, instead, that the court relied upon those meanings to support its holding in the case, especially since specific mention was made of the appearance of the fabric.

"We have examined the lexicographical authorities published since those cited in the *Keveney* case, *supra*, and find no appreciable variation in the language used in defining these terms. For purposes of comparison, we quote from Webster's New International Dictionary, Second Edition:

"**inlay** * * * **1.** To set into the body of a surface or ground material; as, to *inlay* arabesques; also, to pattern or adorn (a surface or ground) by the insertion of other material; as, to *inlay* a panel with lilies; to adorn by inlaying (with); as, to *inlay* wood with mother-of-pearl.

"Accordingly, we find that the common meaning of the tariff term "inlaid" as applied to linoleum refers to that only in which the inlay mix has been set or laid into definite spaces in the structure, and this irrespective of the process by which such result has been obtained. The fact of the penetration of the various patterns from the surface to the backing of the fabric is an incidental, not a decisive, characteristic of inlaid linoleum as that term is commonly understood, which results from the manner in which the inlay mix is applied in the manufacturing process.

"The description of the method of production of the linoleum in issue, as well as the samples thereof which have been received in evidence, clearly establishes that it is not inlaid linoleum within the common meaning of that term.

"The rule is, however, that unless a contrary intention of the legislature be shown, tariff statutes are written in the language of commerce rather than in that in common acceptation, it being presumed, in the absence of proof of commercial designation, that the common and commercial meanings are the same. The burden is upon him who claims a commercial meaning different from the common meaning, to establish that, at and prior to the enactment of the pertinent tariff statute, the relevant language had a meaning in the trade and commerce of the United States which differed from its common meaning, and that such meaning was uniform, definite, and general. *Straus & Co. et al. v. United States* and *United States v. Straus & Co. et al.*, 7 Ct. Cust. Appls. 414, T. D. 36982; *American Express Co. v. United States*, 10 Ct. Cust. Appls. 275, T. D. 38680; *United States v. Briggs Manufacturing Co.*, 14 Ct. Cust. Appls. 1, T. D. 41526; *Walter Johnson v. United States*, 21 C. C. P. A. (Customs) 129, T. D. 46464; *United States v. Armand Schwab & Co., Inc., et al.*, 30 C. C. P. A. (Customs) 72, C. A. D. 218.

"Plaintiffs' argument that there is evidence of a congressional intention that the rule of commercial designation shall not be applicable to the provision for inlaid linoleum is not impressive. A careful review of the history of this paragraph fails to disclose any legislative purpose to restrict the meaning of the term to that in common parlance. There is, on the other hand, implicit support for the receipt of evidence of commercial designation to be found in the *Kereney* case, *supra*, as the court there stated:

"There is no clear proof in the record as to whether there was an established commercial designation of goods answering the description of those involved in this case at the time of the enactment of the tariff act of 1897, so that the question

presented is whether the linoleum in question is shown to have been, as a matter of fact, inlaid linoleum.

"It has here been held that as commonly understood the term "inlaid linoleum" refers to that substance in which the inlaid mix or pattern has been set or laid into definite spaces in the structure of the fabric, and that the linoleum in issue does not respond to that description. Proof as to a different commercial meaning within the rules laid down for such proof will, therefore, be considered."

In dealing with the question of commercial designation in *Jas. Akeroyd & Co.* v. *United States,* 15 Ct. Cust. Appls. 440, T. D. 42641, the Court of Customs Appeals held as follows:

Commercial designation is a thing often claimed in customs litigation and rarely established. The rule of commercial designation was never intended, as has been often said, to apply to cases where some portion of the trade use a certain trade practice or nomenclature, but was intended to apply to cases where the trade designation is so universal and well understood that the Congress, and all the trade, are supposed to have been fully acquainted with the practice at the time the law was enacted. There was never any other reason for the rule.

Only three witnesses gave testimony on the question of commercial designation. The first of these, William J. O'Hara, testified that he started with Congoleum-Nairn, Inc., in 1922, in a sales capacity and continued as a salesman for 16 years, covering only the six New England States. This witness did not testify to any other sales experience prior to 1930 and was, therefore, not qualified to give testimony as to the commercial meaning of the term "inland linoleum," at or immediately prior to 1930, in any portion of the United States, except the six New England States.

The second witness, Wilbur Newman, testified that in 1928, he was with W. & J. Sloane and remained with them until 1931, when we went with Sloane-Blabon Corp.; that in 1928, he covered the territory of "Chicago, Wisconsin, Minnesota, Missouri, Kansas, Iowa, Nebraska, North Dakota, and Illinois." "I've always been on the west coast in later years and also in the south." Just what the witness meant by "in later years" we are left without any clarification or explanation. Under the circumstances, we cannot assume or presume that he was engaged in selling linoleum to the wholesale trade in all of the West Coast States and in all of the states in the South at and prior to June 17, 1930. His testimony, therefore, as to the commercial meaning of the term "inlaid linoleum," at and prior to June 17, 1930, must be confined to the eight states set out above.

The third witness on the question of commercial designation, Samuel O. Sixsmith, testified that for more than 30 years he had been connected with Congoleum-Nairn, Inc., the first 20 years of which time he was a salesman, covering the 16 states in the northern part of the United States, plus the District of Columbia. The

witness was not asked, nor did he offer to name the 16 states "in the northern part of the United States," which he had covered as a salesman. These 16 states may or may not have covered and included the 6 New England States concerning which witness O'Hara testified, or the 8 states testified to by witness Newman.

Totaling the territory in which the three witnesses who testified had sold linoleum on and prior to June 17, 1930, we have not more than 30 states at most, plus the District of Columbia.

During the trial of this case, counsel for the defendant offered in evidence a catalog published by Congoleum-Nairn, Inc., and distributed to its 30 to 40 thousand retail dealers in January 1930. Witness O'Hara testified with respect to said exhibit 6 for identification that merchandise similar to plaintiffs' exhibit 2 was therein designated as inlaid linoleum. The court sustained the objection of plaintiffs' counsel to the receipt in evidence of this exhibit. After reviewing several authorities on the matter, we are constrained to reverse this ruling. Trade catalogs which have been thoroughly circulated throughout the United States, while not alone satisfactory proof of commercial designation, are, nevertheless, competent as indicative to some extent of the trade understanding. *United States* v. *Sheep Shearers Mdse. & Comm. Co.*, 23 C. C. P. A. (Customs) 146, T. D. 48009; *United States* v. *Nordlinger*, 121 Fed. 690; and *Great Western Mercantile Co. et al.* v. *United States*, 25 Cust. Ct. 126, C. D. 1275. The exhibit in question will be received in evidence as defendant's exhibit 6. The general idea running through all the decisions on the question of commercial designation is that the term sought to be established must be definite, uniform, and general, and not local, partial, or personal. In *United States* v. *Brandenstein & Co.*, 17 C. C. P. A (Customs) 480, T. D. 43941, this thought was expressed as follows:

* * * It is incumbent upon a party who asserts that a tariff term has a commercial meaning different from its common meaning to establish that fact by a preponderance of the evidence. Furthermore, if it is to control the classification of imported merchandise, such commercial meaning must be definite, uniform, and general, and not local, partial, or personal. These principles have been stated and restated by this court on many occasions, and we deem it unnecessary to cite authorities in support of them.

In *United States* v. *Kwong Yuen Shing*, 1 Ct. Cust. Appls. 14, T. D. 30773, the Court of Customs Appeals observed:

It is pertinent, then, to inquire what is a commercial designation in a legal sense.

This is aptly defined by the Supreme Court of the United States to be "the result of established commercial usage in commerce and trade" and that the commercial usage "must be definite, uniform, and general and not partial, local, or personal." Maddock *v.* Magone (152 U. S. 368); Berbecker *v.* Robertson (152 U. S. 373).

In *Acker* v. *United States*, 1 Ct. Cust. Appls. 328, T. D. 31431, the Court of Customs Appeals again expressed its views on this subject in the following language:

The further requisite, however, is necessary in assigning to a phrase a commercial limitation or application that it must be proven not alone that the imported merchandise is not classed therewithin, but there must be assigned by proof to that phrase a scope and meaning which is clearly, definitely, and uniformly understood throughout the United States which includes some other merchandise and excludes the imported merchandise. Claffin·v. Robertson (38 Fed. Rep. 92); Sidenberg v. Robertson (41 Fed. Rep. 763). It likewise must be shown in such cases that such meaning of the phrase in trade and commerce should differ from the ordinary dictionary meaning or that of common speech. Maddock v. Magone (152 U. S. 368).

One of the latest expressions by the Court of Customs and Patent Appeals upon this subject is the following from *Nylos Trading Company* v. *United States*, 37 C. C. P. A. (Customs) 71, C. A. D. 422: .

\* \* \* Where the Government contends that an *eo nomine* designation in the tariff law is a commercial or trade term excluding merchandise the subject of a protest, it must prove that as used in commerce the term has a meaning which is *general*, extending over the entire country; *definite*, certain of understanding; and *uniform*, the same everywhere in the country. [Italics quoted.]

There is no proof in this case that the territories covered by the three commercial witnesses were the principal territories or markets in the United States where linoleum was bought and sold, nor is there any evidence to show that the portions of the United States not covered by the testimony of the three commercial witnesses were not the principal territories in the United States where such merchandise was bought and sold. This lack of proof clearly distinguishes the facts in this case from the facts in the case of *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395. In the *Perry* case, a witness testified without contradiction that the States of California, Oregon, and Washington were "the principal poultry. center of the United States." In the absence of proof that the territories covered by the three commercial witnesses were the principal linoleum center of the United States, the *Perry* case is no authority for holding that commercial designation has been established in this case, even if it should be considered that proof of chief use is in any way analogous to proof of commercial designation.

Another case applicable to the facts in this case is that of *Lee & Co.* v. *United States*, 15 Ct. Cust. Appls. 202, T. D. 42236, where the Court of Customs Appeals· observed· as follows:

\* \* \* There is no showing in the record that throughout the United States in trade and commerce the commodity was known as peas. Therefore, the importers have failed to meet one important requirement of commercial proof, in that they have failed to show that their proposed commercial classification was uniform, either throughout the United States or throughout the whole portion of the United States where this commodity was bought and sold.

Measured by the rule laid down in the authorities heretofore referred to and quoted from, it is our opinion that the testimony of the three witnesses who testified that they had sold linoleum in not more than 30 states and the District of Columbia at and prior to June 17, 1930, falls far short of establishing a commercial designation for the involved merchandise which would include it within the nomenclature of inlaid linoleum. Particularly is this true in the absence of any evidence to show that this territory is the principal territory in the United States where this merchandise is bought, sold, and used.

The three commercial witnesses herein were in a position to testify only as to facts within their knowledge, and since they had not sold the merchandise in more than 30 states and the District of Columbia at and prior to June 17, 1930, they did not possess the knowledge necessary to enable them to testify as to how the merchandise was bought and sold and designated throughout the remaining portion of the United States on and immediately prior to June 17, 1930. The mere fact that some years after June 17, 1930, and prior to the trial of this case in 1951, the three commercial witnesses gained a broader experience in the field of linoleum which enabled them to testify how the merchandise was bought, sold, and designated throughout the United States in 1951, cannot serve to enlarge the scope of their testimony beyond more than 30 states and the District of Columbia, in which territory they had been engaged in selling linoleum at and prior to June 17, 1930. Particularly is this true when the witnesses admitted that they could not state how the merchandise was invoiced in 1930.

For the reasons stated, and following the cited authorities, we hold the merchandise described on the invoice as "3rd Gauge Sheet Marble" to be properly dutiable at the rate of 15 per centum ad valorem under paragraph 1020 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, as alleged by the plaintiffs.

To the extent indicated the specified claim in this suit is sustained; in all other respects and as to all other merchandise all the claims are overruled. Judgment will be rendered accordingly.

DISSENTING OPINION

RAO, Judge: I am not able to agree with the majority that the evidence introduced by the defendant is insufficient to prove commercial designation. On the contrary, I believe it has been abundantly established that, at and prior to June 17, 1930, there was a uniform, definite, and general meaning in the trade and commerce of the United States for the term "inlaid linoleum" which differed from its common meaning and which included the merchandise at bar.

Three witnesses, each with a wide experience in selling linoleum through a major portion of the United States, at and prior to June 17, 1930, gave evidence with respect to the commercial understanding of the term in question. Their testimony stands unrebutted.

Witness William J. O'Hara, general branch manager of Congoleum-Nairn, Inc., of Kearny, N. J., manufacturer of smooth surface floor and wall coverings, testified that he started with that company in 1922, in a sales capacity. He continued as a salesman for 16 years, covering the six New England States; became branch manager of the company's New England branch; and 8 years previous to the trial, was made general manager in charge of the company's entire selling operations throughout the United States, sales of the company being consummated through headquarters operations, through distributors, and through 10 branch organizations throughout the country. He stated that his company makes and has made merchandise similar to plaintiffs' exhibit 2; that it is inlaid linoleum, sold by his company under that designation, and has been so sold throughout his entire selling experience. His testimony with respect to commercial designation proceeded as follows:

By MR. WAGNER:

Q. And, in your experience in selling to wholesalers since 1922, has the term inlaid linoleum a definite general and uniform meaning so far as your experience goes throughout the trade of the United States?

\* \* \* \* \* \* \*

THE WITNESS: It has.

\* \* \* \* \* \* \*

By MR. WAGNER:

Q. And, what does that mean? A. Any variegated—it means different color pieces of linoleum, where the various colors and patterns go through the back is termed inlaid linoleum; the coloring.

JUDGE RAO: Do you mean by that, if you walk on it and wear it off, it will always be the same whereas in the cheaper linoleums, when you walk on it, the print comes off.

THE WITNESS: You walk the surface off and the pattern off. The pattern on this piece of goods, which we refer to inlaid linoleum will wear through; will be retained and wear through to the back of the goods. (Referring to Exhibit 2.)

O'Hara further stated that he was able to tell from an inspection and examination of plaintiffs' exhibit 2, the method of its preparation; that it "is a blend of several colors which is calendered in a sheet and cross-calendered and finally keyed to the carrier back as finished linoleum"; that such method of preparation would be designated in the trade as inlaid linoleum; that the retailer is not, however, interested in the method of manufacture; but that if the pattern on the linoleum goes through from the surface to the back, it would be designated in the trade and commerce of the United States as inlaid linoleum, notwithstanding any variance in its method of preparation.

On the subject of the volume of sales by the yard of linoleum made by Congoleum-Nairn, O'Hara testified that the total yardage sold in this country in 1947 was 63 million; that it is estimated that sales in 1950 totaled 75 million yards; and that Congoleum-Nairn's percentage of the total over a period of several years varied from 25 to 33⅓ per centum, of which about 75 to 80 per centum was inlaid linoleum.

Cross-examination of this witness failed to minimize the effect of his direct testimony. He distinguished between plain and inlaid linoleum, the difference being that more colors are formulated in so-called inlaid linoleum, than in plains, and the former is a slower process, and admitted that they are identical in the respect that the single color of the plain linoleum goes all the way through as do the several colors of the inlaid. He referred to various patterns of linoleum made by Congoleum-Nairn, indicating as to each whether it was designated as plain, printed, or inlaid. He was not able to state with accuracy how the different types and patterns of linoleum were referred to in the company's invoices in 1930, for the reason that he was then a salesman in the field, selling from samples and catalogs, but insisted that in his selling transactions merchandise like exhibit 2 was designated as inlaid linoleum; that the pattern would be preserved right down to the back, and simulated throughout, although the surface colors do not necessarily penetrate the fabric in the same vertical position. He reiterated:

A. My understanding of the word "inlaid" is a piece of linoleum where the colors that form the pattern go through to the back of the goods and that the pattern as you see it on the surface maintained on the goods even though foot friction will wear down the composition, the pattern basicly [sic] remains intact.

Wilbur Newman, vice president in charge of sales of Sloane-Blabon Corp., manufacturer of linoleum, testified that he had been with that company since its formation in 1931, and prior thereto, and since 1928, with its predecessor, W. & J. Sloane. In 1928, he covered the States of Illinois, Wisconsin, Minnesota, Missouri, Kansas, Iowa, Nebraska, and North Dakota. In later years, he has always been on the West Coast and in the South. In his present capacity, he supervises wholesale sales for the entire United States, a national distribution, selling to buyers in their home towns and also in New York. Upon being asked to examine plaintiffs' exhibit 2, he stated that it was inlaid linoleum, which, in 1930, his company called marbletone linoleum, and sold as marble or marbletone linoleum. The following questions were then put to the witness, to which he replied as follows:

By MR. WAGNER:

Q. In your experience, has the term inlaid linoleum had a meaning in the trade?—A. It has.

Q. And, was that meaning definite, general and uniform throughout the United States?—A. Yes, it is.

Q. Prior to June 17, 1930?—A. Yes, sir.

Q. What is that meaning?

* * * * * * *

THE WITNESS: The meaning of inlaid linoleum is that the inlaid mix goes through to the back of the goods and is to be distinguished against a piece of goods that is printed. In other words, the composition, while it doesn't go through vertically, is similar in the back up to the base.

Newman produced a piece of linoleum (defendant's exhibit 7), manufactured and sold by his company, which, with a different type of backing material, was manufactured and sold on and prior to June 17, 1930, as marbletone linoleum, standard gauge, and stated that it was inlaid linoleum; that the pattern or design goes through and is simulated from the surface to the back, although not vertically.

When asked on cross-examination to explain what he meant by the statement that the pattern is simulated right down to the back, he testified that by making jaspe sheets "the red color does not necessarily penetrate in a vertical position, but in the form of a marble cake; the same red will be right through to the base; it may change later." He also stated that defendant's exhibit 7 was made in precisely the same manner as plaintiffs' exhibit 2, and was designated in 1930 as inlaid marbletone linoleum; that there is "a difference there between just calling it marbletone linoleum or marble inlaid linoleum. We choose to call it marbletone linoleum"; that he was not able to recall the phraseology on the invoices, but knows from the fact that "samples and everything" were designated inlaid and marbletone linoleum, as distinguished from printed goods; that it was inlaid; and that marbletone and marbletone inlaid would be the same product. He referred to various types and patterns of linoleum sold by his company, indicated whether each was inlaid, or otherwise, and stated that where the patterns or trade names referred to linoleum in which the pattern or design went through from the surface to the back, the goods were inlaid.

Samuel O. Sixsmith, New York branch manager for Congoleum-Nairn, Inc., testified that he had been connected with that company for a little over 30 years, the first 20 years of which he was a salesman covering the 16 states in the northern part of the United States, plus the District of Columbia. Counsel then stipulated that his testimony would be substantially to the same effect as that given by Mr. O'Hara.

In addition there is now in evidence, by virtue of the majority's ruling on the admissibility of defendant's exhibit 6, a trade catalog published by Congoleum-Nairn, Inc., and distributed by that company to its 30 to 40 thousand retail dealers throughout the United States. In it, there is depicted under the designation of inlaid linoleum merchandise similar to plaintiffs' exhibit 2. While, as noted by the majority, standing alone it could not constitute satisfactory

proof of commercial designation, nevertheless, it may properly be considered as supplementing the testimony of defendant's witnesses concerning the generality of the commercial acceptance and understanding of the term "inlaid linoleum."

The foregoing seems to me to be clear and convincing proof that at and prior to June 17, 1930, there was a uniform, definite, and general meaning in the trade and commerce of the United States for the term "inlaid linoleum" which differed from its common meaning, and which referred to and included all linoleum in which the color scheme or pattern penetrated the fabric from the surface to the backing.

It is not to be supposed that the requirement of generality of a commercial designation necessitates proof with respect to every state in the Union. It is sufficient if the trade understanding is shown to be so widely accepted throughout the United States that it has lost its character as a local, partial, or sectional expression. Just where the line of demarcation is to be drawn would, of course, depend upon the facts presented in any given case. Certainly this record, in which the oral testimony is based upon knowledge derived from sales experience in some 30 states, supplemented by a sales catalog distributed upon a nationwide basis, and in which there is no rebuttal evidence, is one for the application of the rule.

In the case of *United States* v. *Graser-Rothe Co. et al.*, 11 Ct. Cust. Appls. 493, T. D. 39631, the uncontradicted testimony of two witnesses, one who had purchased the involved merchandise in Ohio and Illinois and had sold it only in the State of Michigan, and the other with purchasing experience in the State of Ohio, was held "sufficient to establish that the merchandise was definitely, uniformly, and generally, and not partially, locally, or personally bought and sold in the trade as record envelopes."

In the respect of the quantum of proof necessary to sustain a claim of commercial designation with particular reference to the generality of its acceptance in the trade of the nation, I find analogous those cases in which the question of chief use is in issue. As in the case of commercial designation, chief use "involves a territorial or geographical consideration." *United States* v. *S. S. Perry*, 25 C. C. P. A. (Customs) 282, T. D. 49395.

In the *Perry* case, the court was called upon to determine whether celluloid poultry leg bands were free of duty as agricultural implements under paragraph 1604 of the Tariff Act of 1930, a classification dependent upon chief use. The evidence consisted of the testimony of but one witness produced by the importer. He stated that he had been in the poultry supply business for 25 years; that he had purchased poultry leg bands for more than 10 years in New York, Chicago, and in

Kentucky; and that he had sold said merchandise and seen it used throughout the Pacific Coast section, "as far back as Salt Lake City, * * * and the principal egg districts where poultry farming is specialized in." Concerning this phase of the case, the court's observations were as follows:

> We think the above-quoted testimony from the witness Woodhull, who was unusually well qualified, overcomes the presumed finding of the collector, and that since no evidence was introduced to the contrary and no real issue made on the point, it must be concluded that appellee on the question of chief use made a *prima facie* case. Under such circumstances, if the Government sought to controvert the issue, it was its duty to introduce testimony on the subject. See *Klipstein* v. *United States*, 1 Ct. Cust. Appls. 122, T. D. 31120.

> The trial court has found from the evidence of record that the chief use of the merchandise at bar was for the banding of poultry and we think the evidence supports that finding. Certainly we cannot say that its finding is against the weight of the evidence.

> It seems to be the position of the Government that it was the duty of the importer to prove by some witness better qualified than Mr. Woodhull that in every part of the United States the chief use of the article involved was agricultural. In the first place, it is difficult for us to understand how in the poultry supply business it would be possible to produce a witness with a wider experience in selling and handling poultry supplies such as the articles here involved. Woodhull's greatest activities during the ten years immediately preceding his testifying were in the principal poultry raising centers of the United States. Who could be better qualified to give an opinion upon the question? In the next place, if it should appear that in some places in the United States the article was chiefly used for another purpose this fact would not of itself be sufficient to determine that it was not chiefly used for agricultural purposes in the United States. The determination of chief use not only involves a territorial or geographical consideration but the quantity of the merchandise used. It is obvious that poultry is raised in every section of the United States. If the Government's contention, which, in effect, is that a witness or witnesses must be produced to prove actual use in every part of the United States, was approved, in our judgment it would result in a situation where it would be almost impossible to overcome a presumed finding by the collector such as has arisen in this case.

It seems to me, therefore, that there is substantial evidence of commercial designation in this case, and since the plaintiffs have not produced any conflicting testimony, that their claim should be overruled.