**Slip Op. 06-162**

**United States Court of International Trade**

TIMBER PRODUCTS CO.,

                Plaintiff,

      v.

UNITED STATES,

                Defendant.

Before: Pogue, Judge
Court No. 01-00216

[Plaintiff fails to present sufficient evidence to demonstrate commercial designation; judgment entered for Defendant.]

Decided: November 8, 2006

<u>Sandler, Travis & Rosenberg, P.A.</u> (<u>Beth C. Ring</u>, <u>Edward M. Joffe</u>) for Plaintiff.

<u>Peter D. Keisler</u>, Assistant Attorney General; <u>David M. Cohen</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, Commercial Litigation Branch - Civil Division, U.S. Department of Justice, (<u>Edward F. Kenny</u>); <u>Mikki Graves Walser</u>, Attorney, International Trade Field Office, U.S. Department of Justice, for Defendant.

**OPINION**

**Pogue, Judge**: This matter is before the court pursuant to remand from the Court of Appeals for the Federal Circuit ("CAFC") of <u>Timber Prods. Co. v. United States</u>, 28 CIT ___, 341 F. Supp. 2d 1241 (2004)[1] ("<u>Timber I</u>"). In <u>Timber I</u>, the court found, on cross-motions for summary judgment, that the U.S. Bureau of Customs and Border Protection ("Customs") correctly classified the Plaintiff's

---

[1]Familiarity with the court's prior opinion is presumed.

plywood entries under the residual subheading 4412.14.30[2] of the Harmonized Tariff Schedule of the United States ("HTSUS") rather than the more specific provision 4412.13.40[3] advocated by Plaintiff, covering "plywood . . . [w]ith at least one outer ply of . . . 'Virola.'"  The CAFC vacated and remanded Timber I, directing that this court determine whether or not Plaintiff could prove a

---

[2] Subheading 4412.14.30, HTSUS, reads:

4412 Plywood, veneered panels and similar laminated wood:
              Plywood consisting solely of sheets of wood,
              each ply not exceeding 6 mm in thickness:
4412.14                  Other, with at least one outer ply
                  of nonconiferous wood:

    . . .
4412.14.30                    Other.

Subheading 4412.14.30, HTSUS (1997).

[3] Subheading 4412.13.40, HTSUS reads:

4412 Plywood, veneered panels and similar laminated wood
    (con.):
          Plywood consisting solely of sheets of wood, each
          ply not exceeding 6 mm in thickness:
4412.13       With at least one outer ply of tropical wood
            specified in subheading note 1 to this
            chapter:
    . . .
4412.13.40            Other:
                  With at least one outer ply of
                  the following tropical woods:
                  Dark Red Meranti, Light Red
                  Meranti, White Lauan, Sipo,
                  Limba, Okoumé, Obeche, Acajou
                  d'Afrique, Sapelli, Virola,
                  Mahogany, Palissandre de Para,
                  Palissandre de Rio or
                  Palissandre de Rose.

Subheading 4412.13.40, HTSUS (1997).

commercial designation for "Virola," as used in the plywood trade alone, that would apply to Plaintiff's entries at issue.  <u>Timber Prods. Co. v. United States</u>, 417 F. 3d 1198 (Fed. Cir. 2005) ("<u>Timber II</u>").

## BACKGROUND

Plaintiff imported the subject entries of plywood from Brazil during 1996 and 1997.  On its shipping and entry documents, Plaintiff identified the merchandise as "Sumauma (C. Petanda) Plywood," "Faveira (Parkia spp.) Plywood," "Amesclao (T. Burseaefolia) Plywood," "Brazilian White Virola Rotary Cut Plywood," "White Virola Plywood," "White Virola (Virola spp.) Plywood," and "Edaiply Faveira (Parkia spp.)."  Except for "Virola" the species identified are not listed separately as tropical woods in the HTSUS.[4]  Therefore, Customs classified the entries under subheading 4212.14.30, HTSUS, as plywood with at least one outer face of non-coniferous wood.  Plaintiff contends that Customs incorrectly classified these goods, because there is a commercial

---

[4]They are not listed in subheading 4412.13.40, HTSUS, nor are they listed in Subheading Note 1 to Chapter 44.  See note 9 on p. 6, below.

meaning of the term "Virola plywood"[5] that encompasses many different woods, including "Sumauma" "Faveira" and "Amesclao."

Plaintiff admits that it cannot show that the entries at issue consisted of plywood with at least one outer ply of wood from a tree of the "Virola" genus[6] (including all the species thereof, i.e. Virola spp.[7]) but insists before this court that the term "Virola" has a commercial designation, and that the entries at issue consisted of plywood with at least one outer ply of species that fit into the commercial designation for "Virola."[8]   In Timber

_____

[5]For ease of reference, the court adopts the Plaintiff's usage of the term "Virola" or "Virola plywood" to refer to the mixed tropical hardwood plywood product imported by Plaintiff at issue in this case.  This usage is not probative with regard to the sufficiency of Plaintiff's evidence of the existence of a commercial designation for the term "Virola plywood" or the term "Virola" as it is used in the plywood trade.

[6]A "genus" is "[a] classificatory group comprehending a number of species (sometimes a single species) possessing certain common structural characteristics distinct from those of any other group." VI The Oxford English Dictionary 456 (2d ed. 1989).

[7]"Spp." stands for species plurales.  The term and abbreviation refer to all of the species of the given genus. Def.'s Ex. RR, Martin Chudnoff, United States Department of Agriculture Forest Service, Tropical Timbers of the World, 4 (1984); Christopher Morris, Academic Press Dictionary of Science & Technology, 919, 2047, 2067 (Christopher Morris ed., 1992).

[8]The commercial designation test requires that the term that is being offered as having a commercial meaning be the exact term that is used in the statute.  See United States v. Julius Wile Sons & Co., 22 C.C.P.A. 267, 270 (1934) ("the invariable rule [is] that the proof of commercial designation must be made of the exact statutory word or words.").  It appears that Plaintiff attempts to prove the commercial designation of the term "Virola plywood," whereas the HTSUS never uses the term "Virola plywood" but rather refers to "plywood" with an outer ply of "one of the
(continued...)

I, the court found, primarily on the basis of statutory construction, that the Plaintiff did not prove the existence of any intent that the statute was meant to include a commercial designation of "Virola" that extended to species beyond the genus Virola. In this context, the court found that the Plaintiff did not produce sufficient evidence to support its "asserted commercial designation." Timber I, 28 CIT at __, 341 F. Supp. 2d at 1250-51.

The CAFC vacated the decision in Timber I, finding that the court "improperly required Timber [Plaintiff] to present evidence from outside the plywood trade," Timber II, 417 F. 3d at 1202-03, and stating that "[t]he relevant trade for analyzing whether a tariff term has an established commercial meaning is determined by the merchandise before the court in a particular case, not by all the merchandise to which the tariff term might apply." Id. at 1202. The CAFC remanded the case to the court to "reconsider whether Timber proved a commercial meaning for 'Virola' within the plywood trade alone." Id. at 1203.

In giving full effect to the CAFC's decision, the court recognizes that, by remanding the case and positing that this court must consider Plaintiff's proof of commercial designation within the plywood trade alone, the CAFC implicitly must have found that there was no Congressional intent evidenced in the statute that

---

[8](...continued)
following woods" where the names of some specific woods are used interchangeably. The court will presume that this difference is not material.

would trump any possible commercial designation.  <u>Cf.</u> <u>Witex,</u>

<u>U.S.A., Inc. v. United States</u>, 28 CIT __, __, 353 F. Supp. 2d 1310,

1317 (2004) ("an established commercial meaning prevails over a

common meaning unless contrary to Congressional intent.")(citing

<u>Maddock v. Magone</u>, 152 U.S. 368, 371 (1894)); <u>Cadwalader v. Zeh</u>,

151 U.S. 171, 176 (1894).

    Specifically, the CAFC must have found that the structure of

Chapter 44 of the tariff schedule did not indicate a desire on

Congress' part to have a uniform meaning for the term "Virola" that

was preclusive of a commercial designation of the term "Virola"

particular to the plywood trade.  ("Virola" is mentioned several

times throughout Chapter 44 of the HTSUS.[9])

---

[9]Subheading note 1 to Chapter 44 reads as follows:

1.    For the purposes of subheadings 4403.41 to 4403.49, 4407.24
      to 4407.29, 4408.31 to 4408.39 and 4412.13 to 4412.99, the
      expression "<u>tropical wood</u>" means one of the following types
      of wood:

Abura, Acajou d'Afrique, Afrormosia, Ako, Alan, Andiroba,
Aningré, Avodiré, Azobé, Balau, Balsa, Bossé clair, Bossé foncé,
Cativo, Cedro, Dabema, Dark Red Meranti, Dibétou, Doussié,
Framiré, Freijo, Fromager, Fuma, Geronggang, Ilomba, Imbuia, Ipé,
Iroko, Jaboty, Jelutong, Jequitiba, Jongkong, Kapur, Kempas,
Keruing, Kosipo, Kotibé, Koto, Light Red Meranti, Limba, Louro,
Maçaranduba, Mahogany, Makoré, Mansonia, Mengkulang, Meranti
Bakau, Merawan, Merbau, Merpuah, Mersawa, Moabi, Niangon, Nyatoh,
Obeche, Okoumé, Onzabili, Orey, Ovengkol, Ozigo, Padauk, Paldao,
Palissandre de Guatemala, Palissandre de Para, Palissandre de
Rio, Palissandre de Rose, Pau Marfim, Pulai, Punah, Ramin,
Sapelli, Saqui-Saqui, Sepetir, Sipo, Sucupira, Suren, Teak,
Tiama, Tola, <u>Virola</u>, White Lauan, White Meranti, White Seraya,
Yellow Meranti.

Subheading note 1, Chapter 44 HTSUS (second emphasis added).  In
                                              (continued...)

As both this court and the CAFC recognized, there is no definition of the term "Virola" provided in the HTSUS.  Similarly, both this court and the CAFC found that the common meaning of the term "Virola" is "Virola spp."[10]  However, the CAFC found that though the term "Virola" is used in essentially the same manner throughout Chapter 44, such use was not sufficient evidence of statutory intent to preclude a contrary commercial designation in the plywood trade alone.  Therefore, pursuant to the CAFC's remand, this court held a trial to permit Plaintiff to produce evidence that demonstrates that a commercial designation exists for the term "Virola" in the plywood trade alone and that the entries at issue meet such definition.

---

[9](...continued)
some places Chapter 44 references "Virola," while at other points references "tropical wood."

[10]The annex to the Explanatory Notes for Chapter 44 does provide a description, in the form of a chart, comparing the woods listed in subheading note 1 of Chapter 44 against the scientific names of the trees which are denoted by that name, as well as common names for the trees in a variety of countries. Harmonized Commodity Description and Coding System, 2 Explanatory Notes "Annex: Appellation of Certain Tropical Woods" at 690, 713 (2d ed. 1996) ("Explanatory Notes Annex to Chapter 44").  The chart indicates that the scientific name corresponding to the term "Virola" is "Virola spp."  The chart also provides local names for Virola in countries in which Virola is found.  The chart indicates that Virola is found in Brazil, Central America, Colombia, Ecuador, French Guiana, Guyana, Honduras, Peru, Surinam, Trinidad and Tobago and Venezuela.  Other than Virola, none of the wood-names at issue in this proceeding, such as Sumauma or Amesclao, are referenced in this chart.

**FINDINGS OF FACT**

**(A) Uncontested Facts**

The parties have agreed to the facts that follow.

1.    This action contests the tariff classification by Customs of certain plywood imported from Brazil into the United States through the Customs Port of Philadelphia on or between July 6, 1996, and December 2, 1997.

2.    Timber Products Company ("Timber") is the importer of record of the merchandise in the entries which are the subject of this action.

3.    The entries at issue were liquidated, as entered, on or between December 27, 1996 and October 16, 1998.

4.    All liquidated duties, charges or exactions were timely paid and, with the exception of Protest No. 1001-97-100397 involving Entry No. 334-1009194-7, the parties agree that all of the entries at issue were timely protested.

5.    Plywood consists of a panel composed of three or more sheets or "veneers" glued and pressed one on the other which are generally disposed so that the grains of successive layers are at right angles.

6.    Each component veneer of plywood is referred to as a "ply."

7.    Plywood is usually formed of an odd number of plies, with one outer ply called the "face," the other outer ply called

the "backing," and the middle ply or plies called the "core."

8.   While the individual plies comprising a panel of plywood may be of separate and distinct botanical species, plywood is identified in the trade based on the species of its "face" ply.

9.   No single ply comprising the imported plywood exceeds 6 mm in thickness.

10.   None of the imported plywood is surface covered.

11.   The imported merchandise is described on the commercial invoices as Sumauma (C. Petanda) Plywood, Faveira (Parkia Spp.) Plywood, Amesclao (T. Burseaefolia) Plywood, Brazilian White Rotary Cut Plywood, White Virola Plywood, White Virola (Virola spp.) Plywood, and Edaiply Faveira (Parkia spp.).

12.   During the time the imported plywood was entered, plywood with an outer ply of Virola was classifiable under subheading 4412.13.40, HTSUS.

13.   Subheading 4412.13.40, HTSUS, was enacted by Presidential Proclamation, effective January 1, 1996.

14.   At the time the imported plywood was entered, plywood from Brazil classifiable under subheading 4412.13.40, HTSUS, was duty-free under the Generalized System of Preferences ("GSP").

15.   The imported merchandise is wholly the growth, product or manufacture of Brazil and was imported directly into the United States from Brazil.

16.  The botanical identity of the species of each of the outer plies specifically, including each face ply, on each panel in each crate in each entry of the imported plywood is not known.

17.  Virola is the name of a botanical genus consisting of approximately 45-60 different species.  "Virola spp." denotes all species of the genus Virola.  Virola is also a trade, common and/or commercial term.

18.  Sumauma is a trade or common term used to identify the species Ceiba petandra which is of Latin American origin.

19.  Faveira (also spelled Faveria) is a trade or common term used to identify all species of the genus Parkia (Parkia spp.) of Latin American origin.

20.  Amasclao (also spelled Amesclao) is a trade or common term used to identify the species of the genera Trattinickia and Tetragastris of Latin American origin.

21.  Entry No. 334-1009194-7 was entered by Plaintiff on January 28, 1997, as plywood with at least one outer ply of Virola under subheading 4412.13.40, HTSUS, at the rate of 8% ad valorem.

22.  Entry No. 334-1009194-7 was imported from Brazil.

23.  The commercial invoice associated with Entry No. 334-1009194-7 identifies merchandise imported under that entry as being "Faveira (Parkia spp.)."

24.  Customs liquidated Entry No. 334-1009194-7, as entered by Plaintiff on May 16, 1997.

25.  Plaintiff timely filed protest No. 1101-97-100373 on July 18, 1997, claiming the entry was properly classified on entry from Brazil and was duty free under the GSP.

26.  Customs denied Protest No. 1101-97-100373 on August 4, 1997.

27.  Plaintiff filed a timely summons of the denial of Protest No. 1101-97-100373 and voluntarily dismissed that action on November 8, 2001.

28.  Plaintiff filed Protest No. 1101-97-100397 on August 13, 1997.

29.  Customs denied Protest No. 1101-97-100397 on May 4, 2001.

**(B) Additional Findings of Fact from Trial[10]**

30.  Plaintiff presented nine witnesses at trial: five witnesses representing six importers; three wholesale distributors of Virola plywood; and the representative of the Brazilian plywood mills that developed and manufactured the subject plywood, sold it for export to the United States and personally assisted importers in selling the plywood to U.S. wholesale customers.

31.  One of plaintiff's witnesses, John Rego is President of Gulfstream Traders, Ltd. which represented the largest Brazilian mills that manufactured and sold "Virola plywood" to the United

---

[10]The court accepts these facts except as indicated.

States and accounted for approximately 70 to 75 percent of the "Virola plywood" export market from Brazil between 1990 and 1995. Mr. Rego helped with the development of what Plaintiff calls "Virola plywood" as a viable export product from Brazil in the mid-1980s.  Mr. Rego was involved in the manufacturing of "Virola plywood," and knew the raw materials used by the mills and the production capabilities of the mills.  The plywood at issue was produced by a small number of wood mills located in northern Brazil, using a  "mix" of different species of  tropical hardwoods. This plywood was developed by Mr. Rego, along with these plywood mills, to have a product comparable to the "Meranti" and "Lauan" plywood originating from Malaysia and Indonesia.  Mr. Rego worked with the mills to identify the species that could be used to make a better plywood than was being produced in Brazil at the time.  In the late 1980s or early '90s, Mr. Rego, as a Brazilian exporter/ "middleman", began to ship plywood to the U.S. from Brazil.  All but one of the entries at issue in this proceeding were shipped by Mr. Rego's company. Mr. Rego's U.S. customers for "Virola plywood" prior to 1996 were Russell Stadelman & Co., Ihlo Sales, Sitco Lumber, Aljoma Lumber, Timber Products, Ike Trading and Southwest Plyboard.  Mr. Rego accompanied Mr. Heitzman in his sales meetings with U.S. wholesale customers and informed such customers about "Virola plywood."

32. Although Mr. Rego did not specify all of the species which were included, among the species used to produce the new plywood that was to be marketed in the United States were species of the genus Virola, as well as woods of other species, including Amesclao and Faveira. The original American importer of this Brazilian mixed species plywood, Russell Stadelman, decided to market the plywood as "Virola plywood."

33. According to Mr. Rego, the Brazilian plywood mills that manufactured the subject entries sorted plywood by the quality rather than the species of wood on the face ply. The mill, importer/wholesaler, and wholesaler did track the quality or grade of the panels in each crate and sold the merchandise differently based on that grade.

34. The panels that made up each unit, or crate, of plywood had different species of wood on their face plies. But the mill, importer/wholesaler, and wholesaler did not actually track the face-ply species for each panel in a crate.

35. In order to comply with the requirements of Brazilian and U.S. governments that bills of lading identify the species being exported to the United States in a particular shipment, the Brazilian plywood mills would attempt to match their output of plywood to the predominant species used in that production cycle as shown in their inventory records taken from the

logs they had purchased.  No attempt was made, nor was it possible, to identify the species on the outer ply of each plywood panel.

36.  The shipping documents used to make entry, showing terms such as Sumauma, Faveira, Amesclao and White Virola, were not provided to importers' wholesale customers.

37.  Because of a price advantage over tropical hardwood plywood imported from Indonesia or the Philippines, referred to as "Lauan" or "Meranti" plywood, the Brazilian mixed species tropical hardwood plywood met with some success in the U.S. market.  For example, one wholesaler, Furman (now a part of Boise Cascade), succeeded in marketing  Brazilian "Virola" plywood as an alternative to the Indonesian or Philippine "Lauan" or "Meranti" plywood for its customers.  Recognizing a business opportunity, a number of U.S. importers added the mixed species Brazilian tropical hardwood plywood to their product lines.

38.  The subject entries were marketed for use by end users primarily as flooring underlayment, furniture substrates and cabinetry components.

39.  The properties that made the subject entries suitable for these end uses were their price, and their physical properties such as knot-size, grain, low density, strength, and sandability. No quantitative parameters were established regarding the properties of either the end product or the face ply.

40. Representatives of the importers described below, testifying at trial, described their general practice of marketing the Brazilian "mixed-species" plywood that they were importing as "Virola" plywood.[11]

41. Michael Heitzman started selling plywood in 1983 for Russell Stadelman & Co. where he was employed as a salesman, then sales manager, then Vice-President of sales until that company's operations were taken over by Timber Products Company in mid-1995, and he then was employed by Timber Products Company as a sales supervisor for plywood until 2002. Russell Stadelman & Co. started importing and selling "Virola plywood" from Brazil at wholesale throughout the United States in 1986 and had become the largest importer into the United States of "Virola plywood" by 1995. Mr. Heitzman and Russell Stadelman & Co. were largely responsible for introducing "Virola plywood" into the U.S. wholesale market in the late 1980's and early 1990's by marketing it as a less expensive substitute for Asian "Meranti" and "Lauan" plywood for the same end uses. Mr. Heitzman educated U.S. wholesale customers about "Virola plywood" by taking them to visit Brazilian plywood mills and conducting sales meetings for them in the United States.

42. Roy Blackshear is President of Ihlo Sales & Import Company, a family-owned business started by his late stepfather,

---

[11] As noted below, the issue in this proceeding is whether the commercial practice of these importers establishes a commercial designation of such plywood, in the plywood trade, that is general, uniform and definite.

Bill Ihlo in 1973.  Ihlo Sales buys and sells primarily plywood (accounting for 99% of their sales).  Mr. Blackshear started in the business in 1982 as a salesman.  Ihlo Sales started buying and selling "Virola plywood" from Brazil, in and around 1991-92.  Ihlo sold "Virola plywood" at wholesale throughout the United States to wholesale distributors, kitchen manufacturers, furniture manufacturers and some retailers.  By 1995, Ihlo was the second largest importer of "Virola plywood" into the United States after Russell Stadelman & Co., and with Russell Stadelman & Co., accounted for a large portion of the plywood imported from Northern Brazil into the United States.  By 1996-1997, Ihlo had become the largest importer of the mixed tropical hardwood plywood product from Northern Brazil, known by Mr. Blackshear as "Virola plywood", and sold at wholesale throughout the United States.

43.  John Chaffin was Vice-President of Sales and Operations and General Counsel of Liberty Woods International in the years 1990-96 and responsible for the purchase and sale of plywood from Malaysia, Indonesia and Brazil.  In the years 1993 to 1996, Liberty Woods sold plywood at wholesale throughout the United States to wholesale distributors, retail chains, flooring and furniture companies.  Liberty Woods started buying plywood from Brazil in 1991 or 1992 due to inquiries from its customers.  Liberty Woods now imports the same plywood under the nomenclature "Faveira plywood" due to an attempt to "re-brand" the product.

Liberty Woods prepared documentation to sell its product.  Mr. Chaffin, during his tenure at Liberty Woods, relied on <u>Woods of the World</u> to put together information regarding "Virola plywood."  This book was available at Liberty Woods since the time Mr. Chaffin joined the company.  Mr. Chaffin used the book to flesh out his description of the various species.

44. Dwight Hall is owner and President of SWS Associates, Inc. d/b/a Southwest Plyboard of Texas and in the business of importing and selling plywood at wholesale in the United States for approximately 36 years.  He started purchasing what he knows as "Virola plywood" in Brazil in 1991 and visited numerous plywood mills in Brazil in the early 1990's.  SWS Associates imports and sells plywood at wholesale in the United States in a joint venture with Ike Trading.  In the period from 1993 through January 1, 1996, Mr. Hall's company sold "Virola plywood" at wholesale to wholesalers and distributors primarily in the Southwest and Midwest but also on the East Coast of the United States.

45. The testimony of John Bennett was provided by portions of an affidavit and deposition.  Mr. Bennett is President of American Pacific Plywood and has been importing and selling plywood since 1986.  American Pacific imported and sold "Virola plywood" at wholesale to lumber distributors, furniture and fixture manufacturers throughout the United States from 1991 through 1995.

The court did not attribute weight to the testimony of Mr. Bennett, due to the limited nature of the testimony and the multiple corrections on the testimony transcripts.

46.  Christina Hemingway is a product manager for Boise Cascade which took over Furman Lumber in about 1998 where she has been buying and selling plywood at wholesale throughout the United States for 22 years.  Furman was a wholesale distributor that sold plywood to retail lumberyards, home center chains and manufactured housing companies throughout the United States.  She started buying and selling "Virola plywood" in approximately 1990 and visited Brazilian plywood mills in 1991 with Russell Stadelman & Co.  She witnessed the manufacturing process of "Virola plywood" in its entirety at five or six mills in Brazil with John Rego and Russell Stadelman.  She purchased "Virola plywood" from Russell Stadelman & Co., Ike Trading, Liberty Woods, Ihlo Sales and Timber Products.

47.  Aaron Mansbach sold plywood at wholesale for twenty years at Bay Ridge Lumber starting in 1983.  He began purchasing plywood around 1988.  He became a general manager for Bay Ridge Lumber in 1995.  Bay Ridge Lumber was a wholesale distributor of building products and sold commodity plywood to flooring manufacturers, store fixture manufacturers, cabinet makers, and countertop manufacturers in New York, New Jersey, Eastern Pennsylvania, Connecticut, Delaware and Maryland.  "Virola plywood" was introduced to Mr. Mansbach by Michael Heitzman from Russell

Stadelman & Co.  Mr. Mansbach started buying "Virola plywood" from Russell Stadelman & Co., Liberty Woods, Ike Trading, North Pacific and Timber Products.  In the early to mid-1990s, approximately 30 percent of Bay Ridge's business was in plywood of which approximately 25 percent was "Virola plywood."  Mr. Mansbach earned degrees of Bachelor of Science in Forest Management from Rutgers University in 1979 and Master of Forestry from Yale University in 1981.

48.  Henry Braverman has been a sales manager at several building products distribution companies selling plywood at wholesale in the United States since 1979.  He was with Weyerhauser Company from 1979 until approximately 1990, then became sales manager at one of the former Weyerhauser facilities in Freehold, New Jersey that had been acquired by Snavely Forest Products, where he was introduced to "Virola plywood" at a sales presentation made by Michael Heitzman in 1990.  Mr. Braverman was then a sales manager at PlyGems Distribution in New Jersey for a year, then joined Lawrence R. McCoy company ("McCoy") in 1992 where he is still employed.  Starting in 1992, Mr. Braverman sold "Virola plywood" at McCoy, which he purchased primarily from Michael Heitzman from Russell Stadelman & Co., Timber Products and Aljoma Lumber.  Mr. Braverman sold "Virola plywood" primarily for underlayment applications to independent retail lumberyards and

some larger contractor yards primarily in New York City and Long Island.

49.  One of Defendant's witnesses, Regis Miller, Ph.D, was accepted by the court as an expert.  Dr. Miller has a Ph.D in botany from the University of Maryland, and has specialized in wood identification.  He worked at the Forest Products Laboratory at the United States Department of Agriculture Forest Service for almost 40 years until 2005, and from that time has been a consultant in wood identification and an information specialist.  During that period of time, he was asked to identify tropical woods in plywood products and familiarized himself with the terms used by the plywood trade to describe tropical woods.  Dr. Miller testified that the commercial and common meanings of the term "Virola" are one and the same, and that the meaning of the term "Virola," in the plywood trade does not include species outside of the genus Virola.  Although the court does not rely on the testimony of Dr. Miller, he did provide valuable context for the general understanding of the various names of various wood species.

50.  Defendant's other witness was Paul Garretto who has been a National Import Specialist for 30 years for wood products in Chapters 44, 45 and 46 of the HTSUS.  Mr. Garretto acquired his knowledge of plywood and the plywood trade by visiting mills, speaking to manufacturers, importers, sellers, traders, wholesalers and retailers.  Additionally, he gained further information through

reading literature, including periodicals, and through attending conferences and plywood product shows.   Mr. Garretto testified that the commercial and common meanings of the term "Virola" are one and the same, and that the meaning of the term "Virola," in the plywood trade does not include species outside of the genus Virola. While the court found the testimony of Mr. Garretto  tangentially probative, the court will not rely on his testimony or his opinions.

51.   The court will consider specific aspects of the testimony and exhibits below.

**FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In order to show that a commercial designation differs from a term's common meaning, the party proffering the commercial designation must show that the commercial use is "general (extending over the entire country), definite (certain of understanding), and uniform (the same everywhere in the country)" S.G.B. Steel Scaffolding & Shoring Co. v. United States, 82 Cust. Ct. 197, 206 (1979), (citing  Moscahlades Bros., Inc. v. United States, 42 CCPA 78, 82 (1954)),  as opposed to a meaning that is only partial, local or personal,[12]  Maddock v. Magone, 152 U.S. 368,

---

[12]The amount of evidence required to establish a commercial designation of the term has been described as either "plenary proof," S.G.B. Steel Scaffolding & Shoring, 82 Cust. Ct. at 205 (quoting Excelsior Imp. Assocs., Inc. v. United States, 583 F. 2d 513, 514 (1978)),  or a "preponderance of the evidence," (United
(continued...)

371-72 (1894) (further elaborating that were the meaning not general and known throughout the country, or only known in one branch of the trade, then different rates of duty would be assigned at different ports of entry), or "occasional and inconsistent" Hartog Foods Int'l Inc. v. United States, 15 CIT 475, 482 (1991).

"Proof of commercial designation is a question of fact to be established in each case." Cent. Prods. Co. v. United States, 20 CIT 862, 864, 936 F. Supp. 1002, 1004-1005 (1996) (quoting Rohm & Haas Co. v. United States, 727 F. 2d 1095, 1097 (Fed. Cir. 1997)). "Proof must be offered through persons engaged in buying or selling the merchandise at wholesale in the United States, or through persons who know, by their own experience or knowledge, the meaning of the designation applied to the merchandise by those who buy and sell at wholesale." Keuffel & Esser Co. v. United States, 7 CIT 384, 388 (1984) (citing Daniel Green Shoe Co. v. United States, 58 Cust. Ct. 7, 15, 262 F. Supp. 375, 380-81 (1967)).

### 1. General

It bears saying, though it appears obvious, that the country in question is the United States. Even if it is clear in

---

[12](...continued)
States v. Fung Chong Co., 34 C.C.P.A. 40, 55 (1946)(Hatfield, J. concurring). Yet, at the same time, it appears that the standard of proof to be met is high, requiring demonstration that this commercial meaning is "fully and completely understood and accepted throughout the United States by all of those dealing wholesale in that class of goods." United States v. Wells, Fargo & Co., 1 C.C.P.A. 158, 162 (1911).

Brazil that an order for "Virola plywood" is to encompass both plywood with a face ply of the genus Virola, and all of its attendant species, and plywood with a face ply of such species as Faveira and Amesclao that are species within another genus, such proof would be insufficient to establish a commercial designation in the United States.   Two Hundred Chests of Tea, 22 U.S. (9 Wheat.) 430, 438 ("Whether a particular article were designated by one name or another, in the country of its origin . . . was of no importance in the view of the legislature.").  See also Hartoq, 15 CIT at 482 (one trade-person's understanding of the term "pulp" was based on the fact that his employer purchased most of its concentrate from Latin America where it was known as "pulpa" and had a slightly different meaning in Spanish than in English); Russell Stadelman & Co. v. United States, 242 F.3d 1044, 1049 (Fed. Cir. 2001) ("in considering the commercial designation of a tariff term, only commercial use of that term in the United States is relevant.").  Though every single state in the country does not have to be represented, the testimony of the witnesses as a whole should represent a fair cross-section of that trade in the United States, even if one witness is limited in knowledge to one specific region.  See Neuman & Schwiers Co. v. United States, 24 C.C.P.A. 127, 129 (1936) (although some witnesses were restricted in their testimony to one specific region, a consideration of the testimony

as a whole shows that practically all of the United States was covered).

The trade testimony in the trial of this matter was sufficient to prove that the term "Virola plywood," used to describe the plywood at issue, was general throughout the United States. Michael Heitzman stated that "Virola plywood" was imported by Russell Stadelman & Co. throughout the United States. Transcript of Trial at 361-62 ("Tr."). Roy Blackshear testified that Ihlo Sales sold the "Virola plywood" at issue in this case at wholesale throughout the United States to wholesale distributors, kitchen cabinet manufacturers, furniture manufacturers and some retailers. Id. at 362-63. John Chaffin testified that Liberty Woods sold plywood at wholesale throughout the United States to wholesale distributors, retail chains, flooring and furniture companies. Id. at 286. John P. Bennett, through his affidavit and deposition, testified that American Pacific imported and sold "Virola plywood" at wholesale to lumber distributors, furniture and fixture manufacturers throughout the United States from 1991 to 1995. Id. at 444. John Rego testified that Gulfstream Traders, represented the largest Brazilian mills that manufactured and sold "Virola plywood" to the United States and accounted for around 70 percent of the "Virola plywood" export market from Brazil between 1990 and 1997. Id. at 155-56, 170-71. Christina Hemingway testified that she worked for Furman Lumber during the period prior

to 1998 (at which point Boise Cascade acquired Furman Lumber), where she was buying and selling plywood throughout the United States.  Id. at 112, 127-28.   Aaron Mansbach sold plywood, including "Virola plywood," to flooring contractors, store fixture manufacturers, cabinet-makers, and countertop manufacturers in New York, New Jersey, eastern Pennsylvania, Connecticut, Delaware and Maryland.  Id. at 419-20.  Starting in 1992, Henry Braverman sold "Virola plywood" at Lawrence R. McCoy Company to independent retail lumberyards and some larger contractor yards primarily in New York City and Long Island.  Id. at 473, 477.  The totality of the testimony of Plaintiff's witnesses covers the United States. Therefore, the "general" prong of the commercial designation test is satisfied by the testimony of Plaintiff's witnesses insofar as we are able to infer to what "Virola plywood" refers, which brings us to the next prong of the analysis.

## 2.  Uniform

The "uniform" prong (i.e. that the commercial designation be described as the same everywhere throughout the country) of the commercial designation test requires consistent testimony. Commercial designation is not established when there is a conflict in the testimony of the witnesses called to establish the commercial designation. Cent. Prods., 20 CIT at 868, 936 F. Supp. at 1008 ("A commercial designation is not established where there

is a conflict in the testimony of trade witnesses as to the commercial meaning of the term.") (quoting Rohm & Haas Co. v. United States, 5 CIT 218, 227, 568 F. Supp. 751, 758 (1983)); S. G. B. Steel Scaffolding & Shoring, 82 Cust. Ct. at 209.

The proof of commercial designation is not limited, however, to the testimony of witnesses. Courts have also looked to a corroboration or refutation of the testimony through publications. These publications have taken the form of, amongst others, newspaper market reports, price lists, and catalogues, and provide evidence of the commercial designation used in the marketing of the products. See Great W. Mercantile Co. v. United States, 25 Cust. Ct. 126, 134-35 (1950); See also Int'l Customs Serv., Inc. v. United States, 62 Cust. Ct. 653, 658 (1969) ("Trade catalogues have been held to be competent evidence, but they are not conclusive proof of what merchandise is for tariff purposes."); Davies, Turner & Co v. United States, 70 Cust. Ct. 174, 186 (1973) ("it is quite true that the manner in which an article is merchandised has probative value in determining the nature of that article."). The caveat placed on the use of such publications is that they must be "confined to a period at or prior to the date" of the passage of the tariff law. Great W. Mercantile Co., 25 Cust. Ct. at 135.

The testimony of the Plaintiff's witnesses from the plywood trade appears not to present a consistent definition of

"Virola plywood."[13]  While the court will not insist that the trade

_____

[13]The court notes that it is not entirely clear what definition of "Virola plywood" Plaintiff wishes the court to adopt.  The first time that this court considered this case, Plaintiff contended that in the plywood trade there are approximately thirty-five species of trees which are commercially known as "Virola."   This assertion was repeated before the CAFC.  Timber II, 417 F. 3d at 1200 ("According to Timber, the term 'Virola' is a commercial designation in the plywood trade for a group of approximately thirty-five 'near species' of tropical hardwood with similar physical properties, including density and hardness.").  However, during trial, it was unclear as to whether Plaintiff was trying to prove that the term "Virola plywood" has a commercial meaning which encompasses thirty-five near species as previously asserted, or whether Plaintiff was seeking to prove an even broader, previously unasserted, meaning that "Virola plywood" refers to hardwood plywood made from mixed tropical species from Brazil. See Supplemental Br. Pl.'s Supp. Mot. Summ. J. 4-5 ("the term Virola represented a group of near species with similar physical properties of density and hardness used for plywood underlayment and cabinetry substrate."); Id. at 13 ("[t]he [view] that 'Virola' denotes any commodity hardwood plywood from Brazil with similar physical properties and end uses (not limited by just 'substrate flooring') that is similar to Luan [sic] and Meranti is correct.");  Pl.'s Pre-trial Summ. Mem. 6-7.

> if plaintiff shows by a preponderance of the evidence
> that Virola in the wholesale plywood trade throughout
> the United States at the time of enactment was a group
> of mixed species of tropical wood with common physical
> properties of density and hardness suitable for use as
> flooring underlayment and substrates, and that that
> group includes plywood identified on shipping documents
> as "Sumauma," "Faveira," "Amesclao" and "White Virola,"
> then plaintiff will have sustained its evidentiary
> burden and the Court should find for plaintiff.

Pl.'s Pre-trial Summ. Mem. 6-7;  Pl.'s Proposed Findings Fact & Conclusions Law 11 ("The commercial meaning of Virola in the wholesale plywood trade given by all of these witnesses as a 'mixture' of different species with similar properties that make it suitable for the same end uses included plywood identified on entries before the Court as "Sumauma," "Faveira," "Amesclao," and "White Virola.");
     The court will not, and cannot, insist that all witnesses
(continued...)

witnesses repeat their understanding of the commercial meaning of "Virola plywood" exactly or verbatim, uniformity was not established by Plaintiff's testimony.  This is further compounded by the fact that any marketing material or trade catalogue or publication in evidence before the court appears to refer to "Virola" as the botanical genus Virola spp., and not as a mixed species.

Michael Heitzman described "Virola plywood" as a mixture of approximately thirty-five different species that had similar characteristics and properties and that were suitable for the same end uses. Tr. at 10.    John Rego described "Virola plywood" as:

> the commercial term for commodity hardwood plywood with an outer face ply of Virola, that is, to say, one of the species of the group of approximately 35 species including botanical

---

[13](...continued)
testify in the same exact way using precisely the same words as each other.  Cf. Stephen Rug Mills v. United States, 32 C.C.P.A. 110, 114-115 (1944) ("It could hardly be expected that men of commerce could be so well-versed in the phraseology of the statute as the Government insists.").    However, Plaintiff's testimony and evidence must demonstrate the nature of the commercial designation at issue.  In offering up two definitions, Plaintiff puts itself between the proverbial rock and hard place.  If the meaning proffered is of thirty-five species, witnesses who claim that 5 or 6 species (or an unspecified number of species) are included within the commercial meaning of the term "Virola plywood" would be contradicting the definition of thirty-five species.  However, if the definition being proffered is "hardwood plywood made from mixed species from Brazil," then that definition differs from the original definition presented to the court, and also provides a further limitation ("from Brazil") that was not previously represented to the court.  If Plaintiff suggests that both definitions are acceptable, then that may further weaken its case, as then the definition may not be "definite."

> Virola that were segregated by properties and physical characteristics like density, grain, hardness, sandability, so that would render it good for substrate and for flooring underlay.

Id. at 157-58.

Ms. Hemingway described "Virola" as "the tropical hardwood plywood that we brought from Brazil that you could use. It was clear-faced, sandable, that you could use under floor as sublayment or backs of cabinets, and it was a generic name of a panel that served a purpose that could be used for certain applications." Id. at 149. Mr. Mansbach understood "Virola" to be a mixed hardwood plywood from South America, Id. at 422, 432, and did not specify that he understood that the mixed hardwood species used to manufacture the plywood had to be from Brazil. Mr. Blackshear specified that the plywood came from "Northern Brazil[ian] species." Id. at 357. Mr. Chaffin, when describing how in 2000 Liberty Woods started to market their plywood as "Faveira," instead of "Virola," stated "[w]e wanted to establish a different trade name for the plywood from South America," id. at 320, indicating that he did not limit "Virola" as coming solely from Brazil.

There is a disparity between the various definitions provided, because one emphasizes that the plywood represents a mixture of tropical hardwood species from Brazil, while the other emphasizes that there are approximately thirty-five different species,

including botanical Virola.   Mr. Rego, in his testimony, also

appeared to refer to "Virola plywood" as coming from places other

than Brazil:

> Q: Make sure each one has an invoice from your
> company.
> A: One invoice here comes from British Guyana.
> Q: So that is not your company?
> A: That is not even in Brazil, and one invoice
> here is not drawn by Gulfstream, but is drawn
> by one of our mills that we represent, so it
> came, it was from us.   Just that it was
> directly invoiced in that particular case
> according to my instruction.

Id. at 169.

### *Marketing  and other materials*

Mr. Blackshear testified that he visited Dixie Plywood

Stores, and that he saw "Virola plywood" offered for sale at Dixie

Plywood.   Id. at 386-87.   Mr. Blackshear saw the description

provided by Dixie to all their customers, dated 8/07/00.  Id. at

384.   Though this information post-dates the dates of the entries

at issue, Mr. Blackshear agreed with the definition provided as one

that described "Virola plywood."   That description stated:

> Virola, again the name indicates a category of
> wood from the mills in South America,
> primarily Brazil, containing Sumauma, Faveira,
> Fuma, Sande, Banak, Mange, Baboen, Brio, or
> other species.   Wood importers and
> distributors have combined many of these
> species to make it easier on the sales end of
> the business. Keep in mind that there are as
> many as 400 species per acre in the producing
> regions.  Generally South American mills are
> older and less efficient than their Asian
> counterparts.

Id. at 385.

This material contradicts Plaintiff's assertion that "Virola plywood" is commercially known to be "mixed hardwood plywood from Brazil." Mr. Blackshear himself then further disagreed with this definition, which was being circulated in a commercial setting, saying that he did not know "Sande" to be included within "Virola plywood" as he understood it. Id. at 404.

The Agenda from a Russell Stadelman meeting, which "was used to sell plywood," Id. at 70, and was a document supplied to Russell Stadelman & Co.'s customers, Id. at 66, provides a description of "Virola" which also indicates that the species of wood can be found throughout Latin America. Def.'s Ex. M-1, Russell Stadelman & Co. "Agenda" 18. ("Varying with species from Belize and Guatemala southward to Venezuela, the Guianas, the Amazon region of northern Brazil, southern Brazil, and on the Pacific Coast, to Peru and Bolivia; common in swamp and marsh forests."). This description is found in a "glossary of species" which is prefaced "The following glossary of Southeast Asian Hardwoods is a listing of those items most commonly used and marketing [sic] in the U.S. trading area." Id. at 9. Though Plaintiff could, but did not, make the argument that this refers merely to the species and not to plywood, this agenda was produced with respect to marketing plywood. Additionally, and more tellingly, other than Virola spp., no species from Brazil or Latin

America was mentioned anywhere in the document, while the document does mention a variety of species from Asia, including "Red Lauan Group," id. at 14, "Light Red Lauan Group" id. at 15, "White Meranti Group" id. at 16, while all the pages were headed with the term "Shorea", the genus of the Lauan and Meranti "groups". This agenda from Russell Stadelman & Co. also lists a bibliography of resources on Tropical Timbers.  One of the books included in this bibliography is "Tropical Timbers of the World" by Martin Chudnoff. This book provides a description of Virola spp., that lists various common names of Virola, and describes "Virola" as being part of the Myristicaceae family, with the popular names of Banak and Baboen. Def.'s Ex. RR, Chudnoff, 167 ("Chudnoff").  A further description is provided on a separate page for the common name "Virola" referring to the Dialyanthera spp. from the Myristicaceae family, with a popular name of Cuangare.  Id. at 70.  Neither reference to "Virola" refers to a broader mix of species, though both refer to the use of "Virola" in plywood, either as plywood, veneer or corestock.  Id. at 70, 167.[14]  Additionally, a list of Trade Names and Scientific Names is provided at the end of the book, which lists "Virola" as a trade name for Dialyanthera spp. Id. at 464.

Despite the fact that the marketing material did not explain that the term "Virola" when used in connection with plywood

_____

[14]Additionally, though this reference book notes the use of Sumauma in plywood, Chudnoff, at 49, 200 (referring to Ceiba pentandra); it does not refer to the use of Faveira in plywood, id. at 166.

or by the plywood trade presumably referred to a mixture of species beyond that of woods known botanically as Virola, Mr. Heitzman testified that during sales meetings, customers were told orally that it was a mixture of various tropical hardwood species from Brazil, notwithstanding any written materials placed before them. Tr. at 11, 66, 73. Mr. Heitzman testified that when Russell Stadelman would market "Virola plywood" to customers, Mr. Rego would explain the composition of "Virola plywood" and that it contained botanical Virola, Sumauma, Faveira, Mangue, Breu and Amesclao, id. at 11, 105, though Mr. Heitzman would tell them it was a mixture of species, id. at 66, 105. Mr. Rego, on the contrary, did not seem to agree that he would explain the composition of the plywood to the customers:

> [t]he marketing of the plywood was not really done by Gulfstream. The marketing of the plywood was 100 percent done here by the importers and their customers. They are the ones in the marketplace. They are the ones to promote one species or one group of species versus another group of species say from Asia, so even so I made several visits, and I must say I was not the one responsible for the marketing policy of each of these companies that imported here. So there were presentation [sic]. The way they made is their sole responsibilities. I was the middleman, and I was not the one who really laid the policy of marketing for each company.

Id. at 204-205. Plaintiff seeks to nullify the value of the marketing materials through testimony that the marketing materials were supplemented by oral presentations that clarified

and explained that "Virola plywood" consists of a mixture of species of tropical hardwood from Brazil. However, such testimony itself is not fully convincing as Plaintiff's witnesses could not agree as to who provided such supplemental information.

### 3. Definite

#### (a) Lack of certainty

The definite prong requires that the commercial designation be certain of understanding. S.G.B. Steel Scaffolding & Shoring, 82 Cust. Ct. at 206. The inconsistency in Plaintiff's testimony also affects the definiteness of Plaintiff's proffered definition. Mr. Rego testified as to the species included within the term "Virola" as "mainly Sumauma, Faveira, Amesclao, Breu, Mangue, Curipixa, Muiratinga, and botanical Virola." Tr. at 158. Mr. Rego stated, however, that the composition of the groups of woods comprising "Virola plywood" changed over time to exclude Muiratinga. Id. at 165. He also testified that for marketing reasons, he was requested to use the term "Virola" instead of the various species of Sumauma, Faveira, Amesclao, on invoices because "it was difficult to promote a product that was represented with too many names and also for inventory control it was too complicated." Id. at 197-98.

Mr. Rego testified that he did not consistently invoice the merchandise in question from the time he started marketing it

as "Virola plywood," stating that he was occasionally requested to invoice the merchandise as Sumauma, Faveira or Amesclao because he was told that U.S. "customers don't like the name Virola Baboen due to its bad reputation quality-wise."  Id. at 199-201.  Def.'s Ex. J-7 at 2.  The fact that the same product within a very short time span preceding the passage of the HTSUS 1997 was referred to by various different names, and that the different names represented varying species of woods, detracts from Plaintiff's attempt to demonstrate that "Virola" has a definite meaning across the plywood trade.  See Berbecker v. Robertson, 152 U.S. 373, 376-377 (1894) (wherein plaintiff testified that the articles were known in the trade and commerce as "gilt nails" but then admitted on cross examination that "they were sometimes so bought and sold as French, chair and furniture nails" contributing to the court's conclusion that the evidence of a "definite, general and uniform usage" was too slight to be convincing).

Because the test requires that the commercial designation be general, uniform and definite prior to the enactment of the tariff schedule, the shifting commercial practice in the years immediately preceding the tariff enactment makes it difficult to find that the usage of the term was definite enough and established enough that the drafters of the tariff code intended the commercial meaning of "Virola" advanced by the Plaintiff.[15]

_____

[15]Defendant also notes that one company, Liberty Woods
(continued...)

This difficulty with the Plaintiff's proof of definiteness was further demonstrated by the fact that, aside from botanical Virola, witnesses could only agree on a few of the species that are included in the purported commercial designation of "Virola." Almost all of Plaintiff's witnesses testified that Faveira, Sumauma, and Amesclao are included within "Virola plywood." On the other hand, Mr. Blackshear did not testify that Amesclao is included within the definition, Tr. at 357, and Mr. Mansbach limited his definition of "Virola plywood" to a "mixture of species," id. at 422.

In the uncontested facts submitted to the court by Plaintiff and Defendant, the parties agreed that the common meaning (and botanical meaning) of the term "Virola" includes approximately forty-five to sixty species, all of the genus Virola. At the same time, Timber, and several witnesses (Misters Heitzman, Rego and Hall) submit that the commercial term "Virola" includes thirty-five different species, including botanical Virola, and near-species. It is hard to call the commercial designation definite, when a definition of thirty-five near-species could include only Virola

---

[15](...continued)
International, started referring to Brazilian mixed species plywood as Faveira in 1999 in an attempt to establish a different trade name. Tr. at 342-344. Though the change in Liberty Woods' marketing practice, referring to the mixed hardwood plywood it sourced from Brazil as Faveira instead of Virola, could be yet further evidence of the indefinite and constantly changing nature of the term "Virola plywood," the court did not consider this evidence in its examination of the proof of commercial designation, as this change occurred after 1996.

species, or a mixture of species in addition to species of the genus Virola. This is further compounded by the fact that witnesses identified very different numbers for the constituent species from "five or six," to twenty to thirty, to thirty-five. Id. at 357, 438, 448. As Defendant points out "if the term 'Virola' actually is commercially defined to include the 38-45 species of the genus Virola" and also includes thirty-five near species, such as, "Sumauma," "Amesclao" and "Faveira," then the so-called commercial designation would actually encompass a far greater number of different species than the thirty-five claimed by Timber here.[16]    Def.'s Pre-trial Mem. Law 18. The inability to name with some precision how many species are within the proffered definition of Virola does not in and of itself, render the proffered commercial designation impossible, but it does demonstrate a weakness in the Plaintiff's definition.

Plaintiff endeavors to resolve this conundrum by pointing to the United States Court of Customs Appeals decision in United States v. Georgia Pulp & Paper Mfg. Co., 3 C.C.P.A. 410 (1912), stating that "[i]n order to satisfy the 'definiteness' prong of the commercial designation test, it was not necessary for the witnesses

_____

[16]Defendant notes that some definitions of "Virola" include up to sixty different species of the botanical genus Virola, Def.'s Pre-trial Mem. Law 11, while "Sumauma" "Faveira" and "Amesclao" together encompass fifty-four different species, id. at 18. While the court will not decide whether or not the Plaintiff's definition of Virola includes 114 different species, this analysis makes clear that the number could easily reach seventy.

to agree on the entire universe of individual components (e.g., botanical species) of that commercial designation." Pl.'s Proposed Findings Fact & Conclusions Law 31.  Plaintiff  believes that Georgia Pulp & Paper supports this proposition because witnesses there "were at no disagreement that a machine tool was in the trade understood to be one that worked metal in some manner and was limited thereto." Georgia Pulp & Paper Mfg., 3 C.C.P.A. at 413.

The question at issue in Georgia Pulp & Paper, however, was whether or not "machine tools" included machines to work wood in addition to ones that worked metal, i.e., the question at issue was not which machines worked metal, but rather whether or not woodworking machines would fit into the tariff classification.  The court was not facing the question of which metal-working machines were commercially known as machine tools – the court specifically noted that it was only concerned with whether or not the merchandise concerned (wood-working machines) was included or excluded from the commercial meaning of the term "machine tools." Id. at 415-16.  The court found that the term "machine tools" was definite insofar as "it was applied to machines that worked metal," and while that was a broad term, it was not an ambiguous term because the term "'metal-working machines' possesses absolute certainty of meaning."  Id. at 415.  This does not apply to the case at hand.  Though the Plaintiff argues that all witnesses "clearly agreed with the commercial designation of Virola plywood

as a mixture of species, stating '[w]ood importers and distributors have combined many of these species to make it easier on the sales end of the business,'" Pl's Proposed Findings Fact & Conclusions Law 31 n.1, the Plaintiff does not address the fact that not all witnesses agree that the plywood comes only from Brazil, or that it includes near species, or as to whether or not it includes "approximately" thirty-five near species. The remaining definition of "plywood as a mixture of species" presumably from South America, is too vague to render the definition definite.

The Plaintiff also relies upon Two Hundred Chests of Tea, 22 US (9 Wheat.) at 439-440, for the notion that calling something a compound satisfies the "definite" prong. The Plaintiff relies upon the fact that the Supreme Court found that the tea in question met the commercial designation of "bohea tea" which the Court found to mean "a compound made up in China of various kinds of the lowest priced black teas." Id. at 439. The Plaintiff is right that "bohea tea" described a mixture of black teas but was nonetheless found to be definite. However, though the precise elements making up "bohea" tea were not known, the context in which the definite prong was met is relevant. In Two Hundred Chests of Tea, a blend of low value Chinese black teas was sufficient as a definition, when it was to be distinguished only from the competing terms "souchong and other black tea." Additionally, the court found that "bohea tea" was a specific product and that other black teas lost

their specific names (and presumably character) when they were mixed up for sale.  Id. at 439.  Unlike the case cited by the Plaintiff, here the court is being asked to find that the term "Virola" is sufficient to cover any one of five to 114 species, with specific names, that are tropical hardwoods that could be found in Brazil (or in South America), when there are alternate tariff categories within which to place some remaining hardwoods that are not botanical Virola.

Plaintiff also seeks to minimize the importance of any inconsistency in the testimony of its witnesses by arguing that the botanical species that make up the plywood are commercially irrelevant.  Plaintiff relies on Mr. Heitzman's testimony to this effect. Tr. at 26.  The court need not resolve this issue, however, because of other difficulties with Plaintiff's testimony to which the court now turns.

Contrary to the Plaintiff's claimed commercial designation, witnesses Braverman and Mansbach testified that the face ply has to be "of the species Virola".  In Mr. Braverman's case, this indicates the exact problem Plaintiff has with meeting the definiteness prong:

> Q.   Do you see under the trade name column an entry for Virola?
> A.   Yes, I do.
> Q.   Is that a trade name that you have used?
> A.   Yes.
> Q.   Is that also identified under scientific name Virola SPP?

A.  In column 2 that is what it says.  I will give you a yes to that answer.

Q.  Now, when you order Virola plywood from whoever you order from, from importers, you are referring to the species that appears on the face ply?

A.  Yes.

Q.  When your customers order Virola plywood from you, they refer to it as Virola, isn't that correct?

A.  That's correct.

Id. at 497-98.  Though the term "species" was clear in the question, and Mr. Braverman's testimony was a response to cross-examination, it indicates the problem in knowing whether "Virola" means the species of the genus Virola or the larger meaning proffered by the Plaintiff.  Mr. Braverman might have understood that by conceding that "Virola" was the species on the face ply he meant that only species of the genus Virola was on the face ply while the core-stock was comprised of a mixture of wood.  Mr Braverman could have also understood that "Virola" meant one of the Plaintiff's proffered definitions, i.e. one of a mixture of species, and any one of the multitude of species could be on the face ply, and it would still be "Virola" on the face ply.  Thus, the testimony of Mr. Braverman illustrates the difficulty Plaintiff has in establishing the "definite" prong for proof of commercial designation.

This problem was further demonstrated by Mr. Mansbach's testimony.  Mr. Mansbach testified that he had studied forestry.  Id. at 417.  That indicates to the court that he would understand

the difference between a species, a genus, and a mixture of species that were not within a genus. Mr. Mansbach also testified that "Virola plywood" was used in the trade to refer to the botanical species on the face ply:

> Q: No one ever informed you what was included in the mixture of species of the Virola you were buying, is that correct?
> A: Correct.
> Q: As you said, when your customers would send a purchase order or telephone order to you, they requested Virola?
> A: They would request either Virola or Lauan or Meranti. A lot of times people just asked for Lauan, just the first thing that was sold.
> Q: If a customer asked for Virola, you would sell them Virola?
> A: Yes.
> Q: If a customer asked for Lauan, you would sell them Lauan?
> A: We would probably sell them whatever was cheapest.
> Q: Now you agree that plywood is identified by the type of wood on its face ply?
> A: Yes.
> Q: When you sold Virola, you sold plywood which had a face ply of a species of that wood, correct?
> A: Yes.
> Q: When your customer ordered Virola, they referred to the species on the face ply. That's correct?
> A: Correct.

Id. at 429-30. The testimony clearly states that Mr. Mansbach believed "Virola plywood" to have a face ply of Virola, as a species of wood, and that his customers ordered plywood on that basis, contrary to any commercial designation proffered by Plaintiff.

Additionally, the above interchange demonstrates that what the Plaintiff refers to as "Virola plywood" was also referred to as "Lauan."  The interchangeability of "Virola" and "Lauan", as per Mr. Mansbach's usage, also challenges the "definite" nature of the term "Virola plywood."  This was also echoed by Ms. Hemingway in her testimony: "Lauan was the first name for imported tropical hardwood plywood in the United States ... originally it came from the Philippines . . . [the]  Lauan name stuck, and so, when someone asked for Lauan, they were looking for a tropical hardwood plywood."  Id. at 150-51.  If something is known in the trade by more than one name, as is the case here, it is harder to view the "definite" prong of commercial designation as having been met.  See Berbecker, 152 U.S. at 377.

### (b)  Personal

The definite prong also requires that the use not be personal.  Maddock v. Magone, 152 U.S. at 371-72.  The usage of the term "Virola plywood" in this instance borders more on a personal use, as a term selected by Russell Stadelman as optimal for marketing purposes, and then marketed by Russell Stadelman and his agents as such.  This is demonstrated by the testimony of Mr. Rego, who indicated that Russell Stadelman instructed him to use the term "Virola," and by the testimony of the various witnesses explaining how they first came to learn about the product, the name and the

meaning of the name "Virola plywood."  Tr. at 197- 201; Def's Ex. J-7.  Ms. Hemingway testified that she received the name and the information about "Virola plywood" from Russell Stadelman.  Tr. at 117.  Mr. Mansbach testified that he learned about the name after he inquired from his supplier, Russell Stadelman & Co., what the plywood consisted of:

> [w]hen we first got the plywood, the Virola from South America, it was pretty consistent, and then it started to change a little bit, different color, lightly different characteristics, but for the most part it was the same, so the question came up as to what was going on.

Id. at 431-32.  Mr. Braverman testified that he learned about "Virola plywood" through Mr. Heitzman.  Id. at 472, 504. Mr. Blackshear testified that he "generally" heard the term used, but it was primarily from contact in Brazil with Mr. Rego, from his trips to Brazil, and because his customers would tell him about a product that Russell Stadelman was offering.  Id. at 353-63, 389-90.  Mr. Hall testified that he learned the name from Eidai, a mill in Brazil., id. at 279-80, that was one of the mills that supplied to Russell Stadelman & Co., id. at 17, and was represented by Gulfstream Traders, id. at 46, the place of employ of John Rego, id. at 155.  Therefore, it appears that the majority of witnesses learned about the proffered commercial designation from the Plaintiff's agent (or the Plaintiff's predecessor).  This appears to be a usage that was understood by Plaintiff's customers, but the

evidence presented to the court did not establish that the usage extended beyond that circle.  See Berbecker, 152 US at 376-77 (evidence of commercial designation not found when plaintiff's testimony of plaintiff of personal knowledge regarding the trade was found limited "to his own practice.").

At least one company that was outside the main circle of companies that Mr. Rego and Russell Stadelman & Co. (and later Timber Products) traded with on a regular basis used a different appellation for the plywood product at issue in this case.  Mr. Heitzman, as an agent of Timber Products, and other witnesses testified that they knew that Georgia-Pacific, one of the largest domestic wholesalers of plywood (including "Virola") during the relevant time period, did not acquiesce to attempts to refer to Brazilian hardwood plywood of mixed species as "Virola plywood" and did not refer to such plywood by the name "Virola."  Tr. at 76-80, 103-04, 275-76.

### (c) Marketing and other materials

Plaintiff's exhibit 2 is a document titled "Tropical Timber Species Imported into the United States (10/93)" and lists both the "Trade Name" and the "Scientific Name" of various imported species.  Pl.'s Ex. 2, Don. R. Thompson, Animal and Plant Health Inspection Service, Tropical Timber Species Imported into the United States.  Exhibit 2 was introduced to demonstrate that

importers of tropical species into the United States were required to place either a "common" name and/or scientific name onto the bills of lading; this argument was cited in turn in order to explain why Plaintiff had entries that were identified as Sumauma, Faveira or Amesclao.  The accompanying memo, attached as part of the exhibit, explains that parties must make a "'BEST EFFORT' attempt to identify [woods].  This is particularly appropriate for items such as multi-core plywood where the face ply is readily identifiable but where the inner plies may be one, or more, of a variety of species."  Id. at 5.  This memo provides a further example of a Common Trade Name (Meranti)[17] and then the Scientific/ Botanical Name ("Shorea spp. (S. curtisii Dyer, S. pauciflora King, S. aciminata Dyer, S. hypochra Hance, S. faguetiana Heim, S. resinagra Foxw.)").  This list includes "Amesclao", "Faveira", "Sumauma" and "Virola" as trade names belonging to different species.  Id. at 6, 10, 17, 18.  More importantly, "Amesclao", "Faveira" and "Sumauma" are listed separately from "Virola," and

---

[17]As noted above, Plaintiff and Plaintiff's witnesses often compared the mixed nature of "Virola plywood" to "Lauan" and "Meranti" which are made of mixed species.  In both the document provided in Plaintiff's ex. 2 and in the explanatory notes to Chapter 44 of the HTSUS, both "Lauan" and "Meranti" are identified as being comprised of a variety of different species (though all of the same genus).  Pl.'s Ex. 2 at 11, 13, Annex to Explanatory Notes for Chapter 44.  Therefore, it would appear that Plaintiff's proffered commercial designation of "Virola" differs from the comparable definition of "Lauan" and "Meranti," which have separate species listed in both the IHPA document and in the annex to the explanatory notes, and are still each compounds of species within the same genus.

"Virola" is listed as consisting of "Virola, spp.," and does not include "Amesclao", "Faveira" or "Sumauma".  Id.

In addition, Mr. Chaffin, from Liberty Woods testified that the material describing "Virola" on the Liberty Woods website was provided by him.  Tr. at 323.  Even though the website he is referring to is dated to 2003, he testified that he used a definition for "Virola" contained in a "World Woods" book that had been in his office from around the time when he joined Liberty Woods in 1990.  Id. at 322-23.  This book, published in 1986, provides a definition of Virola, Light, that specifies that Virola refers to Virola spp., "including V. koschnyi, Warb., V. sebifera, Aubl., V. surinamensis, Warb., V. melinonii, (R. Ben).  A.C.Smith Family: Myristicaceae."  William A. Lincoln, World Woods in Color, 274 (1986).  This description further provides that the related species include "V. bicuhyba, Warb., heavy virola."  Id.  The book also indicates that the uses of Virola include "[p]lywood manufacture and corestock, and sliced into veneers for decorative work."  Id.  The book clearly contemplates "Virola" as used in plywood, yet does not indicate that "Virola plywood" would include a broader family of species than indicated otherwise.  Id.  World Woods also provides an Index of Standard names, which includes "Virola, Light" id. at 308, and an Index of Vernacular, Trade and Other Names, id. at 309, that indicates that "Virola" is not known by a usage outside of its common name, which in turn, does not

encompass species outside of Virola spp.  Mr. Chaffin also stated that Liberty Woods would not advertise for lumber, Tr. at 309, thereby negating Plaintiff's argument that companies were referring to "Virola" differently for plywood and for lumber.

Additionally, Plaintiff's attempt to establish definiteness is undermined by Defendant's Exhibit Q., Purchase Specifications for Imported Thick Plywood [Thickness 6mm (0.236") and up].  This document was produced by the International Hardwood Products Association ("IHPA")(now known as the International Wood Products Association).  The Plaintiff in this case, and many of the witnesses, are or were members of this association.  Exhibit Q provided a table of categories of commonly used decorative species for plywood.  Def.'s Ex. Q, IHPA, Purchase Specifications for Imported Thick Plywood [Thickness 6mm (0.236") and up] 4.  Category D of this table provides for Fuma, Sumauma, and "Mixed Amazonian Hardwoods (commonly referred to as White Virola)."  The separation of "Sumauma" and "Fuma" from "Virola" indicates the lack of definitiveness in the proffered definition of "Virola," because Plaintiff includes "Sumauma" in the definition of "Virola."  It is also appropriate to infer that because "Sumauma" is listed separately from "Virola," the commercial meaning of "Virola" is not contemplated to include Sumauma.

The court finds that, although Plaintiff has demonstrated that there was a core group of people, mostly associates and

clients of Russell Stadelman & Co. and Timber, that understood "Virola plywood" as marketed by Russell Stadelman & Co. and Timber to refer to a mix of hardwood species from either Brazil or South America, Plaintiff has not proven that this term had a definite meaning extending throughout the plywood trade. The indefinite nature of this term is established by the testimony of Plaintiff's witnesses, and by the variety of documentary materials, that by and large contradict the Plaintiff's definition. Therefore, Plaintiff has failed to meet its burden to demonstrate that "Virola plywood" has a commercial designation that was different from the common meaning of "Virola" and the meaning of "Virola" used throughout the rest of the tariff schedule. The court therefore finds that Customs correctly entered these goods under 4412.14.30, HTSUS, as plywood consisting solely of sheets of wood, each ply not exceeding 6mm in thickness with at least one outer ply of "other" non-coniferous wood, at a rate of duty of 8% ad valorem. Judgment will be entered accordingly.

## JURISDICTION OVER ENTRY NO. 334-1009194-7

Timber also asserts that the court has jurisdiction over Entry No. 334-1009194-7. Defendant has challenged this assertion, claiming that the entry has not been reliquidated and that Timber failed to demonstrate that this entry was actually reliquidated, which is a necessary prerequisite for jurisdiction over this entry.

See  Lowa, Ltd. v. United States, 5 CIT 81, 83, 561 F. Supp. 441, 443 (1983) (where defendant challenges the court's jurisdiction, the plaintiff has the burden of demonstrating that jurisdiction exists).

Evidence of the reliquidation is in the form of a hand-written notation on the protest form, but Plaintiff does not point to a bulletin notice or any other evidence of reliquidation.  Plaintiff, citing SSK Indus. Inc. v. United States, 24 CIT 319, 322 n.7, 101 F. Supp. 2d 825, 828 n.7 (2000) ("government officials are entitled to the benefit of a presumption that their duties are performed in the manner required by law . . . [i]n the absence of an affidavit or other evidence from plaintiff, the presumption that notice was posted is sufficient to negate the existence of a genuine issue of material fact."  (quoting Star Sales & Distrib. Corp. v. United States, 10 CIT 709, 710, 663 F. Supp. 1127, 1129 (1986)), argues on the basis of the hand-written note, that there was a reliquidation. However, SSK Indus. presumed the government had given notice in a situation in which SSK was arguing that notice of reliquidation was not provided to it, resulting in its failure to protest the reliquidation.  SSK Indus. is therefore distinguishable from the case before the court.  If anything, the presumption of correct government behavior would lead this court to believe that had the government reliquidated Entry No. 334-1009194-7, it would have posted bulletin notice of such reliquidation.  See 19 C.F.R.

§ 173.3(b)(1997) (providing that notice of voluntary reliquidation "shall be given in accordance with the requirements for giving notice of the original liquidation"); 19 C.F.R. § 159.9(a)(1997)("Notice of liquidation of formal entries shall be made on a bulletin notice of liquidation, Customs Form 4333."); 19 C.F.R. § 159.9(b)(1997) ("The bulletin notice of liquidation shall be posted for the information of importers in a conspicuous place in the customhouse at the port of entry . . . or shall be lodged at some other suitable place in the customhouse . . ."). Given that Timber alleges that there was a lack of bulletin notice, it appears to the court that the presumption would be that there was no reliquidation to trigger such notice.

However, the court does not need to reach this jurisdictional issue, because even if it were to conclude that it does have jurisdiction over the entry, the effect would be the same, as the court has found that Customs correctly classified the entries at issue in this case.


        Dated:    November 8, 2006
                  New York, New York



                                      _____/s/ Donald C. Pogue_____
        _____        Donald C. Pogue
                                                Judge

ERRATUM


    <u>Timber Products Co. v. United States</u>, Slip Op. 06-162, November 8, 2006, Court No. 01-00216:

    Page 1: In Defendant's counsel, replace the information for <u>Mikki Graves Walser</u> with <u>Barbara S. Williams</u>, Attorney-in-Charge, International Trade Field Office, Commercial Litigation Branch – Civil Division, U.S. Department of Justice (<u>Mikki Graves Walser</u>),for Defendant.


November 9, 2006